Mark R. Thierman, NV#8285 CAL#72913
**THIERMAN LAW FIRM, P.C.**
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027

Attorney for Plaintiffs

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ANTHONY LUCAS, GREGORY H. CASTELLO, LILLIAN MELTON, LEAVON R. SMITH, ROBERT A. GREENE, JAMES A. BIGGS, LARRY DUTCHER, WILLIAM C. SACK, DONALD A. SPEARCE, MERRILL L. CLAIR, BRADLEY J. EDWARDS, and LISA MEDFORD on behalf of themselves and all others similarly situated, ) ) ) ) ) ) ) ) ) ) ) | Case No. 2:08-CV-01792-RCJ-RJJ |
| Plaintiffs, ) ) | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. ) ) ) | |
| BELL TRANS, a Nevada corporation; BELL LIMO, a Nevada corporation; and WHITTLESEA-BELL CORPORATION, and Does 1-50, Inclusive ) ) ) ) ) | |
| Defendants. ) ) | |

**INTRODUCTION**

Pursuant to Federal Rules of Civil Procedure Rule 23, Plaintiff seeks to certify the following subclasses[1]:

> Subclass (A): All current or former employees employed by Defendants in the State of Nevada as limousine drivers within the three years preceding the filing of their Complaint to the date of entry of judgment, who were not paid wages by Defendant for all hours worked in violation of Nevada Revised Statutes § 608.016.

> Subclass (B): All current or former employees employed by Defendants in the State of Nevada as limousine drivers within the three years preceding the filing of their Complaint to the date of entry of judgment, who were discharged and not paid within three days after the wages or compensation became due or who resigned or quit and were not paid on the day the wages or compensation became due in violation of Nevada Revised Statutes § 608.040.

These class definitions exclude all persons employed by Defendants as drivers of taxicabs and all persons over whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of Section 204 of the Motor Carrier Act of 1935 (such as employees who regularly transport passengers interstate or to the airport on a "through ticket" interstate or who require, as a matter of law, a CDL (commercial drivers license) or equivalent in order to perform their duties.

Plaintiffs and Plaintiff class were subject to the uniform practices and policies of Defendants, whereby Defendants failed to pay Plaintiffs and Plaintiff class for, e.g., mandatory orientation time, pre- and post-shift duties (limousine drivers are required to arrive 15 minutes prior to their scheduled shift), washing cars (not only are the drivers required to wash the cars on their own time without pay, but they are required to pay for the wash and are fined a fee if the limousine is not considered clean) and for any time during their scheduled shifts when they were not driving a fare, even though they were under the control of Defendant and required and/or suffered and permitted to work during such times. Plaintiffs and Plaintiff class also seek waiting-penalties for all limousine drivers who terminated

---

[1]Plaintiffs reserve the right to bring an opt-in class for their FLSA claims.

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

1   employment and were not properly paid these wages due by Defendants within the last three

2   years pursuant to Nevada Revised Statutes § 608.040.

3         The requirements of Federal Rule of Civil Procedure 23 are plainly satisfied in the

4   case at bar. The class members within the subclasses are numerous, yet easily manageable.

5   All of the critical questions of law and fact are common to the members of the class. The

6   claims of the named Plaintiffs are typical of those of the class. Plaintiffs are adequate

7   representatives and competent counsel represents the class.

8                               **STATEMENT OF FACTS**

9         Defendant Whittlesea-Bell Corporation is the holding company for Bell Trans and

10   Bell Limousine. Brent Bell is the President and in charge of these companies. Brad Bell is

11   the Vice President of Bell Limousine. Larry ("Chip") Bell, Jr. is the Chief Executive Officer

12   of Bell Limousine. J. J. Bell, Brad's brother, is the general manager for Bell Trans. All of the

13   members of the Board of Directors of Whittlesea-Bell Corporation are members of the Bell

14   family. All of Defendants' limousine companies are commonly operated under uniform

15   policies and procedures. See, Exhibit "A", Declaration of Leslie A. Knoll-Montoya, past

16   Human Resources and Assistant to the General Manager of Bell Limousine (hereinafter,

17   "Montoya Decl."), at 2, lns. 1-16 and 24-27.

18         At all relevant times herein, Defendant Bell Trans was and is a Nevada corporation

19   certified by the Nevada Transportation Service Authority to be, and is engaged, in the

20   business of providing limousine services with its principal place of business at 1900 Industrial

21   Road, Las Vegas, Nevada. Defendant is an employer within the meaning of N.R.S. 608.011

22   for all employees employed in Nevada.

23         At all relevant times herein, Defendant Bell Limo was and is a Nevada corporation

24   certified by the Nevada Transportation Service Authority to be, and is engaged, in

25   the business of providing limousine services with its principal place of business at

26   100 Sunshine Lane, in Reno, Nevada. Defendant is an employer within the meaning of

27   N.R.S. 608.011 for all employees employed in Nevada.

28

THERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

1    The Complaint in this action was filed on December 18, 2008 and amended on

2  July 10, 2009.  Plaintiffs and Plaintiff class are or were employed by Defendants as limousine

3  drivers during the putative class period and were not paid for all hours worked in violation of

4  Nevada Revised Statutes § 608.016.  Approximately forty employees or former employees of

5  Defendants have already "opted in" to this action.

6    Defendants' limousine drivers are routinely scheduled to work 8-1/2 hour days and are

7  required to report to work 15 minutes prior to the scheduled starting time of their shift.  See,

8  Exhibit "B", Bell Trans Rules, at 23, ¶ 3.

9    The drivers are required to check in at Bell's yard locally, pick up the keys from

10  the dispatcher, prepare the car to be ready by making sure the car is clean (the driver is

11  required to pay for cleaning products), doing paper work, if it's a "bar run" getting ice

12  (which the driver is required to pay for) and napkins (which the driver must pay for),

13  checking in with the dispatch, and traveling to the airport, all without any pay for this time.

14  Montoya Decl. at 3, lns. 4-15; see generally, Exhibit "C", Driver's Rules & Regulations.  All

15  this time is unpaid, including the time spent driving to the airport.  The driver than waits for

16  his or her first trip, still not on the clock and not getting paid.  Montoya Decl. at 3, lns. 13-15.

17    The clock starts when the driver leaves the airport to pick up or deliver the first

18  passenger.  For example, if the driver has to wait in the airport holding a sign to get his first

19  fare, he is not paid even for that time he spends looking for the fare, until the fare is loaded

20  with the guest's luggage and leaving the airport.  The time starts on the trip sheet when the

21  driver actually leaves the airport.  If the driver doesn't have a fare in the car, he is not paid.

22  The clock stops when the driver returns to the airport, and he is not paid for the time waiting

23  for the next fare.  This is called being paid from Port to Port.  Montoya Decl. at 3, lns. 16-23.

24    Another example is when a driver drops off all the passengers at a hotel limousine

25  stand.  The time spent waiting for the next fare is not being paid at all.  Although the driver

26  cannot leave the car, he does not get paid because there is no fare.  Montoya Decl. at 3, lns.

27  24-27.

28

1   In reality, the customer is charged by the hour, so the driver only gets paid for the time

2   that the customer pays Defendants.  Montoya Decl. at 3, lns. 28-29.

3   Defendants also require drivers to wash the limousines on their own time, without pay,

4   and make the drivers pay for the wash themselves and/or the drivers are fined for unclean

5   vehicles.  Montoya Decl. at 4, lns. 19-21.

## ARGUMENT

**I. IN THEIR MOTION FOR CLASS CERTIFICATION, PLAINTIFFS ARE NOT REQUIRED TO ESTABLISH THEY WILL PREVAIL ON THE MERITS OF THEIR CLAIMS**

It is well settled that any examination of the merits of a claim is inappropriate in the

context of a motion for class certification.  See, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156,

177-78, 94 S.Ct. 2140 (1974).  In *Eisen*, the United States Supreme Court explained that

"nothing in either the language or history of Rule 23 […] gives a court any authority to

conduct a preliminary inquiry into the merits of a suit in order to determine whether it may

be maintained as a class action." 417 U.S. at 177.  "'In determining the propriety of a class

action, the question is not whether the Plaintiff or Plaintiffs have stated a cause of action or

will prevail on the merits, but rather whether the requirements of Rule 23 are met.'"  *Id.* at

178, quoting *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971).  See also,

*Staton v. Boeing Co.*, 327 F.3d 938, 954 (2003); *Andersen v. City of Albuquerque*, 690 F.2d

796, 799 (10th Cir. 1982; *Pablo v. Servicemaster Global Holdings, Inc.*, 2009 U.S. Dist.

LEXIS 79584, at *11 (N.D. Cal. 2009); *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 475 (N.D. Ill

2009); and *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 606 (W.D. Pa. 1983).  Also, in ruling

on a motion for class certification, the district court must accept the substantive allegations

of the complaint as true.  *Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975); *In re*

*Applied Micro Circuits Corp. Securities Litigation*, 2003 U.S. Dist. LEXIS 14492, at *6

(S.D. Cal. 2003).

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

## II. PLAINTIFFS MEET EACH OF THE PREREQUISITES OF 23(a)

Rule 23 (a) of the Federal Rules of Civil Procedure sets out four initial prerequisites for class action treatment:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

### A. The Class Is So Numerous That Joinder Of All Members Is Impracticable

Approximately 40 class members have filed consents to sue in this matter. More importantly, Defendants have declared there are approximately 1,319 putative class members in this action. See, Exhibit "A" to Defendant's Response to Plaintiff's Motion for Circulation of Notice of the Pendency of This Action pursuant to 29 U.S.C. 261(B) and Other Relief with Memorandum in Support Thereof, at ¶ 10, Dkt. 47. This a case where limousine drivers are not paid for mandatory orientation time, pre- and post-shift duties (the limousine drivers are required to arrive to work 15 minutes prior to their scheduled shift), time spent washing the limousines (not only are the drivers required to wash the cars on their own time without pay, but they are required to pay for the wash and are fined a fee if the limousine is not considered clean), and for any times during their scheduled shifts when they are not actually driving a fare as a matter of Defendants' standard policy and practices. Therefore, each of these 1,319 limousine drivers will have been subject to Defendant's illegal practices of failing to pay them wages for all hours worked in accordance with the requirements of Nevada Revised Statutes § 608.016. While it is not necessary to specify the exact number of class members for the purposes of class certification, 1,319 putative class members inarguably satisfy the numerosity requirement of Rule 23 and even 40 class members presumptively create sufficient numerosity.

There is no arbitrary number recognized as an appropriate threshold, but classes of less than fifty have routinely been considered sufficient. *Buttino v. FBI,* 1992 U.S. Dist. LEXIS

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

THERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

1  21919 (N.D. Cal. 1992) (Judge Armstrong certified class of 34 known participants on grounds

2  joinder would be impractical), *Siegel v. Chicken Delight, Inc.*, 271 F. Supp. 722, 724 (N.D. Cal.

3  1967). Several federal cases on this issue have held that classes of over 40 individuals are

4  numerous enough to meet the numerosity requirement. See, *Ikonen v. Hartz Mountain*

5  *Corp.*, 122 F.R.D. 258, 262 (U.S. Dist., 1988); see also, *In re Kirschner Medical Corp.*

6  *Securities Litigation*, 139 F.R.D. 74, 78 (U.S. Dist., 1991) (class size of 25 to 30 members

7  raises presumption that joinder would be impracticable). Still another court found that

8  14 were enough to establish numerosity. *Grant v. Sullivan*, 131 F.R.D. 436, 446 (U.S. Dist.,

9  1990). See, *Horn v. Associated Wholesaler Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977)

10  (applying a liberal interpretation of the Rule 23(a) requirements, and referring to *Davy v.*

11  *Sullivan*, 354 F. Supp. 1320 (1973), in which a 10-member class was upheld). The numerosity

12  requirement of Rule 23(a)(1) is thus easily fulfilled by 1,319 putative class members in this

13  matter.

### B.   There Are Questions Of Law And Fact Common To The Class

15  The predominating questions in this action are primarily ones of law and they

16  are common among the proposed class members. These questions include, for example:

17  (1) whether mandatory pre- and post-shift time worked by Plaintiffs and Plaintiff class is

18  compensable, (2) whether time spent washing company vehicles as required by Defendants

19  on threat of penalties is compensable, (3) whether time spent in mandatory orientation is

20  compensable, (4) whether time spent driving to destinations to pick up fares is compensable,

21  (5) whether time spent waiting for fares is compensable[2], and (6) are waiting-penalties due to

22  those limousine drivers who were not timely paid these wages after termination. Common

23

24

---

25  [2]Nevada Revised Statutes § 608.016 provides:

26  An employer shall pay to the employee wages for each hour the employee works. An
   employer shall not require an employee to work without wages during a trial or break-
27  in period.

28  Nevada Administrative Code § 608.115(1) provides:

1  questions of fact include are Plaintiffs and Plaintiff class paid wages by Defendants for

2  mandatory pre- and post-shift duties, for time spent off the clock waiting for fares, for time

3  washing limousines on their own time, etc.

4  Plaintiffs and Plaintiff class perform all of these duties during times they are under

5  the control of Defendants and required and/or suffered or permitted to work by Defendants.

6  Plaintiffs and Plaintiff class are required to perform these duties as a matter of Defendants'

7  standard policy and practices. These questions apply across the board to the members of

8  the proposed class and the commonality of these questions is not subject to serious dispute.

9  Plaintiffs seek to certify two subclasses, the members of which were all subject to

10  Defendants' uniform policy of failing to pay wages for all hours worked and/or were

11  subject to Defendants' uniform policy of failing to properly pay them for these wages due

12  upon discharge or quit.

13  In order to support class certification, Plaintiffs are not required to demonstrate

14  success on the merits. Plaintiffs are only required to show that there is at least one issue

15  whose resolution would affect a significant number of putative class members. *Stewart v.*

16  *Winter*, 669 F.2d 328, 335 (5th Cir. 1982). See also, *Dukes v. Wal-Mart, Inc.*, 509 F.3d

17  1168, 1177 (9th Cir. 2007) ("[t]he commonality test is qualitative rather than quantitative –

18  **one significant issue common to the class may be sufficient to warrant certification"**

19  [emphasis added]). Although Defendant may argue that there are individual issues (e.g., the

20  amount of damages, i.e., the amount of hours worked without pay and the amount of waiting

21  penalties owed to terminated limousine drivers during the putative class period), these issues

22  can be addressed by Defendant's own payroll records and business records that are kept for

23  purposes other than litigation.

24

25  An employer shall pay an employee for all time worked at the direction of the
employer, including time worked that is outside the scheduled hours of work,
26  **including, but not limited to, preparatory activities required by the employer**
**prior to the beginning of a shift and clean up activities after the end of the shift.**
27

(Emphasis added.)

28

Plaintiffs' Motion for Class Certification                                                                8

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

**C.** **The Claims Of The Representative Party Are Typical Of The Claims Of The Class**

The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "The typicality requirement is satisfied if the claim 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Santoro v. Aargon Agency, Inc.*, 252 F.R.D. 675, 681 (D. Nev. 2008).

The typicality of Plaintiffs' claims is uncontestable. They, like the rest of the class members, worked as limousine drivers within the state of Nevada but were not paid for all hours worked, including for any orientations, mandatory pre- and post-shift duties, and for all non-driving times during shifts they were required and/or suffered and permitted to work. Defendants required its limousine drivers to work these hours and perform these duties while under their control as a matter of the company's standard policy and practice, but uniformly failed to pay its limousine drivers for these hours worked. There are also named Plaintiffs whose claims are typical of putative class members who terminated employment and were not paid these wages due to them by Defendants timely after discharge or quit pursuant to Nevada Revised Statutes § 608.040. The claims of Plaintiffs and Plaintiff class are based on the same legal theory – failure to pay for all hours worked and failure to properly pay these wages due upon termination of employment. In addition, the typicality requirement "may be satisfied even when 'there is a disparity in the damages claimed by the representative parties and the other class members." [Citations omitted.] *Id.*

**D.** **The Representative Parties Will Fairly And Adequately Protect The Interests Of The Class**

The remaining requirement under Rule 23(a) is that the class representative be able to protect the interests of the class fairly and adequately. This requirement is met if the named

THERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

Plaintiffs do not have interests that are antagonistic to those of the class and if the named Plaintiffs' attorneys are qualified to conduct the litigation as a class action. See, *Riker v. Gibbons*, 2009 U.S. Dist. LEXIS 35449, at \*14 (Mar. 31, 2009 D. Nev.), citing *Hanlon*, 150 F.3d 1020.

As demonstrated above, the interests of the representative Plaintiffs are fully congruent with the interests of the class. Where the representatives possess the same interest and have suffered the same injury as other members of the class, they will generally be considered to be able to represent the class fairly and adequately. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364 (1982) and *Riker*, 2009 U.S. Dist. LEXIS 35549, at \*14.

Further, the typicality requirement of Rule 23(a)(3) demands only that the "essence" of liability allegations be similar among class members; dissimilarities in individual members' claims will not defeat certification. *Steiner*, 96 F.R.D. at 609.

As to the qualifications of Plaintiffs' counsel, the accompanying declaration of Mark R. Thierman sets forth the experience of Plaintiffs' counsel in employment-related matters, in class actions, and in complex civil litigation. It is respectfully submitted that these qualifications are sufficient to satisfy the Court that the interests of the class members will be fairly and competently represented by Plaintiffs' counsel. All of the requirements of Rule 23(a) for maintaining this action as a class action are thus easily fulfilled.

## II.   PLAINTIFF ALSO MEETS THE REQUIREMENTS OF RULE 23(b)

Rule 23(b) provides in relevant part that a class action may be maintained if the requirements of Rule 23(a) are met and if:

(1)   the prosecution of separate actions by or against individual members of the class would create a risk of:

(A)   inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B)   adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or

THERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

substantially impair or impede their abilities to protect their interests; or

(2)    the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3)    the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Those statutory requirements are plainly met in the instant case, as discussed below.

## A.    The Prosecution Of Separate Actions By Individual Members Would Create A Risk Of Inconsistent Adjudications

The circumstances presented by the instant case are precisely the kind for which class treatment is most appropriate. Rule 23(b)(1)(A) is designed to avoid the situation where numerous Plaintiffs file separate actions over the same set of facts and obtain different resolutions of common factual and legal issues. That undesirable result is almost certain to occur if the individual class members were to file separate actions in the present matter.

If 1,319 potential class members filed separate actions pertaining to Defendants' company-wide policy at issue in this matter, it is extremely likely that, somewhere along the line, such parties would obtain differing resolutions of the critical legal and factual issues that the cases all share, as discussed above. If that result did, in fact, occur, Defendants would be faced with inconsistent standards governing the propriety of their conduct in connection with the determination of, for example, whether they were required to pay Plaintiffs and Plaintiff class members required to pay for pre- and post-shift duties (including the 15 minutes pre-shift limousine drivers were required to arrive at work), whether they were required to pay for time spent cleaning and washing vehicles, and whether they were required to pay for all hours worked even if not transporting fares. It is just such a situation that Rule 23(b)(1)(A) seeks to avoid by authorizing the maintenance of a class action.

THERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

**B.     The Prosecution Of Separate Actions By Individual Members Would Create A Risk Of Individual Adjudications That Are Dispositive Of The Interests Of Other Members Not Party To The Adjudications**

Rule 23(b)(1)(B) authorizes the use of the class action in situations where an individual adjudication, while technically not conclusive of the rights of other similarly situated individuals, is likely to be dispositive of those rights as a practical matter. (See, Notes of Advisory Committee on 1966 Amendments to Federal Rules of Civil Procedure, Rule 23.)  The present case is again a classic situation demonstrating the applicability of the rule.  The same reasoning that makes Rule 23(b)(1)(A) applicable to the facts of the present situation also makes Rule 23(b)(1)(B) applicable.  If this action does not proceed as a class action, it is virtually certain that many individual actions would be brought on behalf of the 1,319 putative class members.  An order or judgment in any one of those actions will establish a rule that Defendants must pay Plaintiffs and Plaintiff class members for all hours they were suffered and permitted to work under the control of Defendants and waiting-penalties to all terminated employees.  Thus, although the ruling in one case would not operate as *res judicata* against another individual plaintiff, it would, as a practical matter, have a determinative effect on the rights of the latter.  In order to preclude such a situation, Rule 23(b)(1)(B) authorizes the maintenance of an action like the present one as a class action.

**C.     The Party Opposing The Class Has Acted On Grounds Generally Applicable To the Class**

As discussed, the present matter could be maintained as a class action under either subdivision (A) or subdivision (B) of Rule 23(b)(1).  It could, however, also be maintained as a class action under Rule 23(b)(2).

Again, this case constitutes a textbook example of circumstances appropriate for class action treatment.  The entire litigation involving the state claims of Plaintiffs and Plaintiff class revolves around Defendants' policy of not compensating its limousine drivers for hours they are required and/or suffered and permitted to work and performing duties while under the control of, and required as a condition of employment, by Defendants.  The duties are virtually identical, Defendants' policy of when and how they must be performed are

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

THERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

1   virtually identical, and it is Defendants uniform policy not to pay for these hours worked.

2   Indeed, the actions complained of are actions challenged on grounds virtually identical

3   throughout the class.

4         **D.**    **This Action Could Properly Be Brought Under Rule 23(b)(3)**

5         Because the class herein is certifiable under Rule 23(b)(1) or Rule 23(b)(2), it is

6   unnecessary for Plaintiffs to assert Rule 23(b)(3) as a basis for certification. If it were

7   necessary to do so, however, this action could surely be certified under that section as well.

8   Rule 23(b)(3) authorizes class certification where the four 23(a) prerequisites are met plus

9   two additional requirements are satisfied. The two 23(b) requirements are "predominance"

10  and "superiority." Common questions must predominate over any questions affecting only

11  individual members and class resolution must be superior to other available methods for the

12  fair and efficient adjudication of the controversy." *Amchem Products, Inc. v. Windsor*, 521

13  U.S. 591, 117 S.Ct. 2231, 2246 (1997). As shown above, common issues of fact and law in

14  this case certainly predominate over individual ones. Moreover, it cannot be denied that a

15  single class action is far preferable to the multiplicity of actions that would result if this class

16  were not certified. The purpose of the class action device is to aggregate claims that may not

17  be worth pursuing individually, and this is just such a case. *Eisen*, supra.

18        Clearly, the subclass definitions based upon the common practices of Defendants are

19  the preferred manner to determine the rights of the subclasses. All members of the Subclass

20  A were limousine drivers who were subject to the same policies of Defendants regarding

21  failure to pay wages for all hours worked and, thus, Plaintiffs and Plaintiff class were subject

22  to the same unlawful behavior of Defendants. All members of the Subclass B were limousine

23  drivers subject to the same policies of Defendants regarding failure to timely pay all wages

24  due at the time of termination and, thus, Plaintiffs and Plaintiff class were subject to the same

25  unlawful behavior of Defendants.

26        The circumstances presented by the instant case are precisely the kind for which class

27  treatment is most appropriate. Federal Rules of Civil Procedure Rule 23(b)(1)(A) is designed

28  to avoid the situation where numerous plaintiffs file separate actions over the same set of facts

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

1  and obtain different resolutions of common factual and legal issues.  That undesirable result is

2  almost certain to occur if the individual class members were to file separate actions in the present

3  matter.  If a hundreds of actions were filed over the policies and practices at issue in this matter,

4  it is extremely likely that, somewhere along the line, the parties would obtain differing

5  resolutions of the critical legal and factual issues that these cases all share, as discussed above.  If

6  that result did, in fact occur, Defendants would be faced with inconsistent standards governing

7  their policies and practices.  It is just such a situation that the law seeks to avoid by authorizing

8  the maintenance of a class action. (See, e.g., *United States Trust Co. v. Executive Life Ins. Co.*,

9  (S.D.N.Y. 1984) 602 F.Supp. 930, upholding class treatment in an action by beneficiaries against

10  fiduciary for breach of trust.)  Additionally, many of the class members are current employees

11  who would be naturally reluctant to bring an individual lawsuit against their employer.  See,

12  *Amalgamated Workers Union v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540 (3rd Cir.

13  1973).

## CONCLUSION

15  For all of the foregoing reasons, Plaintiff's motion should be granted in its entirety

16  together with such other further and different relief that the Court deems proper.

17  Dated this 21st day of September, 2009.       Respectfully submitted:

18  THIERMAN LAW FIRM

20  By:     /s/Mark R. Thierman
21       MARK R. THIERMAN
        Attorney for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

# EXHIBIT A

Mark R. Thierman, NV#8285 CAL#72913
**THIERMAN LAW FIRM, P.C.**
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ANTHONY LUCAS, GREGORY H. CASTELLO, LILLIAN MELTON, LEAVON R. SMITH, ROBERT A. GREENE on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs,<br><br>v.<br><br>BELL TRANS, a Nevada Corporation, Does 1-50, inclusive<br><br>Defendants. | Case No.: 2:08-CV-01792-RCJ-RJJ<br><br>**DECLARATION OF LESLIE A. KNOLL-MONTOYA IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT** |

**Declaration of Leslie A. Knoll-Montoya**

1

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

I, Leslie A. Knoll-Montoya, hereby declare and state:

From August of 2006 until August 2007, I was employed by Bell Limousine as the human resource person and assistant to the general manager for Bell Limousine, , Airport Minibus and Whittlesea Taxi, which are all owned and operated by Whittlesea-Bell Corporation. Whittlesea-Bell Corporation owns and operates eight transportation companies in Nevada. The companies are Bell Trans, Presidential Limousine, Whittlesea Blue Cab, Henderson Taxi, Las Vegas Strip Trolley, Bell Limousine, Airport Mini-Bus, and Whittlesea Taxi. There is a single board of directors and a single chief financial officer for all these companies. Brent Bell is the President of all eight companies and he is in charge of all of them. Brad Bell is the Vice President of Bell Limousine, Whittlesea Taxi and Airport Minibus. Larry ("Chip") Bell, Jr. is the Chief Executive Officer of Bell Limousine, Whittlesea Taxi and Airport Minibus. JJ Bell, Brad's brother, is the general manager for Presidential Limousine and Bell Trans. All the members of the Board of Directors of Whittlesea-Bell Corporation are members of the Bell family.

Whittlesea Blue Cab, Whittlesea Taxi and Henderson Taxi operate taxi cabs only. Bell Limousine, Bell Trans and Presidential Limousine operates (about 300) stretch limousines which seat 8 to 14 people, including the driver, and weigh less 10,000 gross. It is not required to have a CDL (Commercial Drivers License) to operate these limousines because they do not meet the 14 plus 1 (14 passengers plus a driver) minimum for Department of Transportation regulation. Airport Minibus has minivans rather than stretch limousines, and requires a CDL license or a class C license with a "P" ("Passenger") endorsement. All the companies operate the same unless otherwise noted hereinafter with drivers going from one company to the next often.

All the Whittlesea-Bell Corporation entities engaged in the transportation industry have the same management. All the drivers of the Reno branches of the Whittlesea-Bell

**Declaration of Leslie A. Knoll-Montoya**

2

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

Corporation subsidiaries are paid by a single payroll department, run by the same person, who is the office manager in Reno for all the Bell transportation entities. The main office in Reno is located at 100 Sunshine Lane, in Reno.

Bell Limousine drivers are all paid on a commission basis without any overtime premium. The drivers are required to check in at Bell's yard locally, pick up the keys from the dispatcher, prepare the car to be ready by making sure the car is clean (which the driver is required to pay for cleaning products), doing paper work, if it's a "bar run" getting ice (which the driver is required to pay for) and napkins (which the driver must pay for), checking in with the dispatch, and traveling to the airport, all without any pay for this time. From the hundreds of times I have seen this occur, I would estimate it takes at least 20 minutes in the yard before driving to the first stop (usually the airport) where there is another dispatcher. All this time is unpaid, including the time spent driving to the airport. The driver than waits for his or her first trip, still not on the clock and not getting paid.

The clock starts when the driver leaves the airport to pick up or deliver the first passenger. For example, if the driver has to wait in the airport holding a sign to get his first fare, he is not paid even for that time he spends looking for the fare, until the fare is loaded with the guest's luggage and leaving the airport. The time starts on the trip sheet when the driver actually leaves the airport. If the driver doesn't have a fare in the car, he is not paid. The clock stops when the driver returns to the airport, and he is not paid for the time waiting for the next fare. This is called being paid from Port to Port.

Another example is when a driver drops off all the passengers in Las Vegas at a hotel limousine stand. The time spent waiting for the next fare is not being paid at all. But the Driver can't leave the car, but does not get paid because there is not fare.

The customer is charged by the hour, so the driver only gets paid for the time that the customer pays Bell. The driver gets a percentage of the fare which varies by the vehicle, but

**Declaration of Leslie A. Knoll-Montoya**                                                          3

its usually 25% of the fare.  But the driver of a stretch limousine only gets 18.75% of the fare, and the driver of a Hummer gets only 15.625% of the fare.  There is no overtime paid although drivers routinely work more than 40 hours in a week. The company requirement for benefits like vacation pay, and medical insurance is working 50 hours a week.  Although I was not in payroll, I routinely distributed all the checks to the drivers in Reno, and was responsible new driver orientation which includes explaining how drivers are paid.

Airport minibus drivers are paid on one of two methods. If it is a charter trip, they are paid a commission the same as the limousine drivers (although the percentages may vary).  If it is a "program run", then they are paid by the hour. Some hourly bus driver, like "the Summer Trolley" which is a contract with Placer County, is not paid for driving a Bell vehicle from downtown Reno to the start of the run in Placer county.  However, none of the drivers paid commission are paid overtime on their commissions.  All the drivers are not paid for the time they spent cleaning the car in the yard before or at the end of their shift.

In addition, Bell charges all drivers for a Nextel radio to communicate with Bell's dispatch.  Bell charges all the drivers an airport fee, which I believe is one dollar per trip, all the cleaning products for the vehicles, and charges the drivers for damages to the vehicle if the driver was at fault.  Bell would inspect the limousine or if a driver reported he received the car in a dirty condition, Bell would charge the driver $10.  Bell also made the drivers wash the car on their own time, without pay, and make the driver pay for the wash itself.  Bell made the drivers on the "bar run" cars pay for ice, napkins, and broken or missing bar-ware (glassware and decanters, etc).  I saw Bell try to charge one driver. Merrill Claire for a broken TV, but Merrill refused to pay and Chip Bell fired him before the company could deduct the money from his paycheck.

Bell also charged the drivers for any damage to the vehicle whether they were at fault or not, up to $500, although I have heard of one driver (Brandon Fields) who was charged

**Declaration of Leslie A. Knoll-Montoya**                                             4

$800 recently. In some cases, I believe that these deductions from pay may have caused the drivers to go below minimum wage.

In January, 2007, I was aware of wage changing regulations because Nevada had changed the minimum wage in its constitution. I approached Brad Bell and told him that there was a change in the law of minimum wage and that I was going to look into it. He said "Don't bother, it doesn't affect us." I said some of the drivers had mentioned it to me and I am pretty sure it does affect us. He said, "Don't worry, I have lots of lawyers" and he was not going to change the way Bell paid its drivers.

Attached hereto as exhibit A is the Las Vegas Handbook, and attached as exhibit B is the Reno handbook.

I have read the forgoing declaration consisting of this page and 4 others, and declare under penalty of perjury that it is true and correct. Executed this _9_ day of March 2009 at Reno, Nevada.

Dated: 3-7-09

Leslie A. Knoll-Montoya

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

**Declaration of Leslie A. Knoll-Montoya**

5

# EXHIBIT B

# BELL TRANS

## RULES

Page

INTRODUCTION                                                    3

DEFINITIONS                                                     3

MANAGEMENT AND SUPERVISION                                     6

STANDARDS                                                       6

DISCIPLINE AND DISCHARGE

PERSONAL INFORMATION

TIPS RECEIVED                                                   8

EMPLOYEE Parking                                               8

WORK RELATED INJURIES / WORKERS COMPENSATION
STATE INDUSTRIAL INSURANCE SYSTEM (S.I.I.S.)                    8

EMERGENCY PROCEDURE                                            8

DRESS AND GROOMING                                             9

NON-COMPETITION                                                9

OUTSIDE ACTIVITIES                                            10

BULLETIN BOARDS AND POSTING NOTICES                           10

TRAFFIC CITATIONS                                             10

TIPPING                                                       11

Revised 11/1/95

YOUR VEHICLE.....,,,,,,,,                                                      11

HOT WEATHER DRIVING / AIR CONDITIONING                                        13

IN THE EVENT OF AN ACCIDENT.                                                  13

GENERAL RADIO AND DISPATCH PROCEDURES                                         14

TRIPSHEETS WORK ORDERS AND VOUCHERS .                                         15

MONETARY RESPONSIBILITIES .                                                   16

LUGGAGE                                                                       17

SERVICE AND FARES
    General,,,,,,,,,,                                     18
    Airport Transfer Service ._                            18
    Charter Limousine Service,,,,,                         20
    Mini~Bus: Special Services..,,,,,,,                    21
    Charter Bus Service,,,,,,,,                            21

GENERAL RULES AND REGULATIONS,.,,,,,                                          22

SUGGESTIONS FOR A PROFESSIONAL DRIVER..,.,,,,,                                24

UNION,,,,,,,, --                                                              25

UST OF STANDS AND ZONES...,,,,,,                                              2

NOTES,,,,., --                                                                28

Revised 11/1/95

BELL TRANS

## RULES

## *INTRODUCTION*

This Handbook Contains rules to which you will be expected to follow during your career as a driver for BELL TRANS, along with information to help you be a successful employee.

In addition to these rules, other specific instructions are posted from time to time on Company bulletin boards. Bulletin board notices are as important as these rules, and must be observed by you in that manner, IT IS YOUR OBLIGATION TO READ THE INFORMATION POSTED, Failure to do so will not excuse your failure to comply with any instructions Posted.

The absence of a written rule covering a specific situation does not relieve you of responsibility for your actions. In such a situations you must apply common sense and good judgment consistent with the principles found in Company rules, the law, and the highest standards of generally accepted Social behavior.

You will generally be held to very high standards of performance in every area of your work. The section, "STANDARDS" later herein, is intended to make you aware of special considerations of uniquely high concern.

## DEFINITIONS

As Directed          A term used to let you know the party who has ordered the vehicle will direct you. Usually these charters will last more than one hour.

Baggage with Sign    Dispatch has assigned you a move to the airport to meet customers in the Baggage Claim Area with a sign which is available at the Bell Trans booth with the parties group or individual name on it. Be sure to sign in at the Bell Trans booth,

Revised 11/1195

| | |
|---|---|
| Charged Tip | Amount placed on an order (either a Percentage or a set dollar amount) which will appear on your printout. This **amount is to be included on your paperwork and** will also be on your next paycheck, Tips added to vouchers for per capita service are deducted from your cash turn-in. |
| Checks | A drive-through of certain hotels to which you have been **assigned to check and see if anyone is going to the** Airport on our per capita service. Checks are done from **6:00 a.m. to 6:00 p.m.** ~t all major hotels. **Before 6:00** a.m. and after 6:00 p.m., the pickups are on an "on-call **basis,"** |
| Clear | Your vehicle is empty of passengers and you are available. |
| Clear at 41 | You are requesting Dispatch to put you in the line-up at the Airport. |
| Clear at 41 and | You are informing Dispatch you are clear at the Airport Going Back and are requesting to return and hold the Strip. |
| Company Station | The terminal located at 1900 Industrial Road. |
| Cruise | To travel from the Strip or Downtown to the Airport while you are clear. |
| En route | A term used to let Dispatch know you have your Passengers in the vehicle and for Dispatch to begin running your time in the computer for your move. Do not go en route on a cash move before you have been paid. |
| Front Loading | A term used for a serious violation against another driver when you go out of turn and load passengers in front of another driver who was assigned to that pickup. Always check with dispatch first before you load passengers on the Strip or Downtown. |
| Gender | He, him, his are gender inclusive. |
| Hold | To be put in a line-up on the Strip or Downtown awaiting for pickups at the hotels. |

4

Kelly

A term used for a cash move in which no prior order or reservation is made. You must be clear to accept a Kelly. The customer will have exclusive use of the vehicle and pay the hourly rate.

Move

A particular order that you are assigned to do. Example: Dispatch informs you that you have been requested to do a move from the Mirage at 8:00 p.m. for the Smith party.

No Show

You were on time at the designated location for a move and your party failed to show. For a cash move you must wait at least 1 5 minutes prior to departing. On a charge or prepaid move, you must· wait out the hour. In either event, take directions from the dispatcher.

Per Capita

A term used for Customers using our shuttle service (hotels to Airport; Airport to hotels, only).  They are charged on a per person basis.

Printout

A computer-generated slip with all pertinent information about the move you have completed, it will be located in the basket at the window where you pick up your keys and must be completed by you and turned in with your paperwork. If, for any reason, you cannot obtain a printout, write up an order manually.

Reservation Number

A seven digit number which will be given to you by Dispatch assigning you a particular move. You must write the number down and return the number back to Dispatch when you have completed the move. Also, enter the number in the appropriate space on your trip sheet.

Side Money

A tip, toke or gratuity. Remember you may not solicit a tip, toke or gratuity in any way from a customer.

Up Top

A term used for the loading area for Passengers at the Airport (Level One; see map).

Zero Level

Location below Level One of the Airport used as a place to park your vehicle while you attempt to locate your Customers in baggage. Waiting time is one-half hour; any longer and you may receive a ticket (see map).

5

## MANAGEMENT AND SUPERVISION

*whittlesea Bell*

BELL TRANS is one of a related group of companies which operate cooperatively. Included in that group are:

Henderson Taxi    *whittle check*
Las Vegas Strip Trolley   *Bell Limo*
Presidential Limousine   *A MB*
Whittlesea-Checker Taxi

Management and supervisory personnel of each of these companies exercise authority over employees in all other operations within the group. Therefore, you must consider supervisory personnel in operations, shop or office of any company as your immediate supervisor.

## STANDARDS

*Limo*

BELL TRANS is a leader in Limousine and Mini-Bus service. The Company and its drivers are highly respected for the superb quality of service provided, Every driver, new or old, must at all times perform in a manner which brings credit to his fellow drivers and the Company,

*Limo*

BELL TRANS drivers are held to the highest standards by the Company. Drivers are expected to strictly observe all Company rules, and in the absence of a specific rule, to observe in their actions unequivocal adherence to the principles enunciated below,

The Company's operations are conducted pursuant to revocable authority grantee by the Public Service Commission of Nevada. Any action which endangers, or MIGHT endanger that authority, or the respect of the Commission cannot be tolerated; any such action jeopardizes the Company and the jobs of all employ.

The Company conducts operations to and from public (e.g., McCarran Airport *RAF*) and private (e.g., Hotel) premises, Permission is revocable at any of those premises, Action which jeopardizes or MIGHT jeopardize, our permission to operate to or from any of these premises cannot be tolerated; since this action jeopardizes the Company and the jobs of all employees.

The success of the Company, and the enjoyment of rewards by Company and drivers, is dependent upon maintaining the goodwill of our customers, They will continue to employ us, and to recommend us, only so long as they receive the quality of service they expect and we promise (i,e,, the highest possible level),

Remember: Respect, Consideration Cooperation No deviation from these

6       Revised 11/1/95

standards is acceptable. Alienation of a single customer has a negative impact on every driver, and the Company.

Our limousines and buses transport millions of passengers each year. The safety of those Passengers is essential. Equally essential is minimizing the Company's exposure to accident loss; we are a target for claimants. **ANY DRIVING PRACTICE, WHETHER IT RESULTS IN AN ACCIDENT OR NOT, WHICH PLACES THE COMPANY OR OUR PASSENGERS AT RISK, OR MIGHT PLACE THE COMPANY OR OUR PASSENGERS AT RISK, IS UNACCEPTABLE.**

To deal with the high volume of business we do, all departments (drivers, dispatchers' service personnel, office and management) must function as a team. Conflict between employees cripples the teamwork and is unacceptable. There are appropriate channels for resolving problems; confrontation is not one of them and must be avoided.

Finally, our public image is extremely important to us all. All drivers should conduct themselves publicly in a manner which will always bring credit to the Company and to themselves as a group; anything less can only serve to diminish our image, and cannot be accepted.

## DISCIPLINE AND DISCHARGE

Failure to follow all rules Contained in this manual or posted on the bulletin board, or to conform all activities to the "STANDARDS" described in this manual, will expose you to that discipline deemed appropriate by the Company, up to and including termination.

Within this manual, in some circumstances, there is a specific caution that certain action can result in termination of employment. This must not be construed as a limitation on activities for which termination may be deemed appropriate. ANY unacceptable activity MAY justify termination.

## PERSONAL INFORMATION

Immediately notify the business office of changes in address, telephone number, marital status, number of dependents insurance beneficiaries names of persons to be notified in case of accidents or emergencies, etc.

This information affects your benefit programs, taxes, etc.

You must have a working telephone, and provide the number to the Company,

7

## TIPS RECEIVED

Forms are available at the business office for recording and declaring tip income. Federal law requires tip income to be reported for any month in which more than $20.00 was earned.

## EMPLOYEE PARKING

Personal automobiles are not allowed on Company property at any time; bicycles and motorcycles may be parked in the first level of the garage under the north stairway only. Automobile parking is provided for employees at two locations: (1) the southeast corner of Industrial and Wyoming, and (2) the northeast corner of Industrial and Chicago. Employees' vehicles parked at these locations must have a Company parking sticker. The Company is not responsible for damage or theft of your vehicle or any contents. Permission to park at these locations, or any locations, may be withdrawn at any time. Unauthorized vehicles parked on any Company property will be towed at the owner's expense.

## WORK RELATED INJURIES / WORKERS COMPENSATION
## STATE INDUSTRIAL INSURANCE SYSTEM (S.I.I.S)

An employee who is injured on the job, no matter how slightly, is required to report the injury to his supervisor immediately. As provided in S.I.I.S. Regulations, the Company may designate the doctor who makes the first examination of your injury. An employee who is injured on the job, except only for emergency cases, must obtain a referral slip from the business office, supervisor or dispatcher as appropriate, who will direct you to the proper medical facility.

Workers compensation benefits are fully paid for by the Company.

REMEMBER: USE YOUR LEGS, NOT YOUR BACK, TO LIFT.

## EMERGENCY PROCEDURE

Should you be concerned about your safety with a passenger, or for any reason, you should notify the dispatcher immediately by adding "Z" to your call number and giving the destination or whatever information which can be safely conveyed. You should say, "74Z going to (the address)." The dispatcher will immediately notify a supervisor and/or the police, who will meet you at the destination.

**THIS IS FOR EMERGENCIES ONLY!**

Revised 11/1/95

## DRESS AND GROOMING

All visible clothing must be solid black with the exception of the shirt which must be white (sleeve length optional). Black "jeans" are not acceptable.

Solid black neckties must be worn from October 1st through May 31st. Bola ties are optional during the summer months for airport transfer and bus drivers. Charter drivers may remove their jackets during these months, when not with customers and when not meeting customers. Bola ties are a concession to the extreme heat. Neckties are preferred. You may wear articles of clothing (ties, etc.) with the Company name and/or logo, which have been secured from the Company. Because you may be needed in charter limousine service always carry a necktie and suit jacket.

Appropriate Company issued hats must be worn in Airport Transfer Service when the vehicle is one of those in the passenger loading area. In charter service, hats must be worn when meeting flights inside the terminal.

In some charter work a more flexible dress code will be acceptable. However, this is never the case in Airport Transfer Service. Changes must be approved by the manager on a case-by-case basis. You must be in proper uniform when you call in service at the Company Station.

Extreme or ostentatious jewelry is not permitted (e.g., large, dangling bracelets, earrings worn by men, etc.). Come to work well rested, clean shaven and properly dressed. Hair length for men should not extend past the top of the collar. Beards and extreme sideburns are not acceptable. Mustaches which do not extend below the upper lip are acceptable.

We are continually striving to maintain and improve our standards. We realize that work and weather conditions make it difficult to maintain the desired appearance, but we are confident that we have the caliber of employee to accomplish this task.

### TAKE PRIDE IN YOUR APPEARANCE!

## NON-COMPETITION

Management is not unsympathetic to the aspirations of any employee who makes application to regulatory authorities for permission to engage in motor carrier activities which would be in competition with BELL TRANS.

Revised 11/1/95

We have concluded, however, that it unreasonably burdens the employer/employee relationship to have a prospective competitor continue in an employee capacity. We further believe that the employee may be placed in the difficult position of having to resolve conflicts of interests and be unable to avoid either damaging his own interests or being viewed as disloyal. The adversarial relationship created in this atmosphere is not constructive to the employer or employee.

Any employee who desires to engage in ~ any activity which might conflict with the interest of, or be in competition with, BELL TRANS or its affiliated companies will be expected to resign his position with BELL TRANS before commencing any efforts to engage in the conflicting activity.

## OUTSIDE ACTIVITIES

You may not engage in any outside activity or other employment which would be damaging to the Company. These activities include those which would adversely affect your job performance, customer relationships, our ability to compete with other companies, etc.

You must report current or future outside business activities to management, This Practice will prevent any misunderstandings and potential problems.

## BULLETIN BOARDS AND POSTING NOTICES

Official Company bulletin boards are installed in the drivers' room. All posting on these bulletin boards will be done by management,

An employees' bulletin board will be provided for personal notices such as vehicles for sale, etc. All personal notices should be dated and will remain posted for a reasonable period of time. These notices may not be defamatory or offensive in nature.

## TRAFFIC CITATIONS

All citations (both for moving violations and for illegal parking) are the responsibility of the driver. They either must be paid promptly or the necessary legal remedies must be pursued. Excessive violations could result in termination.

A printout of your driving record from the Department of Motor Vehicles is required to be submitted to the Company on or immediately before your anniversary date, each year.

Pursuant to Federal Motor Carrier Safety Regulation handbook, if cited while in a commercial motor vehicle you must inform the company with in 30 days of the date you are convicted.

Revised 11/1/95

## TIPPING

The Company does not encourage tipping of any other employee. No driver is required to tip a supervisor, dispatcher, mechanic, serviceman, or anyone else employed by the Company.

If an employee solicits a "toke," you are required to report that person to the General Manager.

Everyone should be aware of the difference between a gratuity and a bribe.

## YOUR VEHICLE

You are driving an expensive, luxury limousine, sedan or mini-bus. Its cleanliness is your responsibility. ~~A car wash, vacuum, paper towels, etc, are provided by the Company.~~ Also, it is your duty to report mechanical problems and property damage. During your orientation, you will be shown reporting procedures. Quarterly your vehicle will be detailed. You are responsible for costs or, if you prefer, we will provide you with the needed materials and you may detail your vehicle. Without your vehicle, you cannot make money. With a dirty, poorly maintained vehicle, you will make less money than your fellow drivers. TAKE CARE OF YOUR VEHICLE.

Be sure that all seat belts are visible, clean and in good working order. You should always wear your seat belt. It is a legal requirement. Encourage your passengers to do so also. This is especially important when children are on board.

At the beginning of the shift, the driver must clean the exterior of his or her vehicle. **This includes the** white **walls and wheels. At the end of the** shift, **the** driver must see **that the vehicle is** serviced **and ensure that the gallons of** gas used are entered on his trip sheet. Also, he must clean the interior and trunk of his vehicle.

Do not leave your vehicle unattended unless it has been locked and you have the keys. No one may drive your vehicle except another BELL LIMO employee,

11

Revised 11/1/95

Drive over speed bumps with extreme caution. To do otherwise is considered abuse of Company equipment and may result in termination.

## YOU EARN YOUR LIVING WITH YOUR VEHICLE
## TAKE CARE OF IT AS IF IT WERE YOUR OWN!!

Servicemen only will gas your vehicle and check engine fluid levels.

Never continue to drive a vehicle which has a problem, IMMEDIATELY STOP and notify the dispatcher. The dispatcher will send a tow truck. If you continue to drive a vehicle with a problem, resulting in damage, you will be charged for damages or terminated for abuse of Company equipment.

If your vehicle is disabled **and you need a tow, give the dispatcher the exact** location, including the direction your vehicle is headed, and what the problem is. Put **the emergency flashers on and raise the trunk** lid and hood,

Except for another vehicle owned by the Company, never jump a battery for, or push, another vehicle.

**Do not idle the engine any time you are stopped, waiting.** Idling unnecessarily increases maintenance costs, wastes fuel, and is considered abuse of Company equipment.

Two repair slips must be made **on each vehicle needing maintenance,** One must be turned into the dispatcher and one placed on the dash of the vehicle for the mechanic. Repair slips must clearly identify the problem. Don't try to diagnose the problem; describe the symptoms that led you to believe there is a problem. (Example: "Brakes," this doesn't tell us much but if you write: "Brakes are making noise," we know what symptoms to look for,)

When leaving the metropolitan area (e.g., trips to Mount Charleston, Hoover Dam, etc.), you must have a spare tire and tire changing tools.

Instructions for servicing your vehicle at the completion of your shift:

(a)   When you reach the gas pumps, don't shut the engine off until instructed to do so by the serviceman,

(b)   DO NOT LEAVE THE VEHICLE while in the service line.

12

Revised 11/1/95

(c)   Do not pull away from the gas pumps until the serviceman has written down gas amount and initialed your trip sheet. He will then instruct **you that he is finished, the gas hose has been removed and that you** may leave.

Id)   **When you have completed servicing the vehicle, park** it in **the** designated parking space for the vehicle. DO NOT PARK around the **dispatch office or car wash. Make sure that all lights and the two-way** radio is off and that all windows are rolled up. Check the rear of "stretch" limousines to be sure that everything is off. Return the key **to the dispatch office.**

## HOT <u>WEATHER DRIVINGI</u> AIR CONDITIONING

Never idle an engine with the air conditioning on for more than three (3) minutes,

**Breakdowns and maintenance** expenses increase dramatically during hot weather. This can be directly attributed to the use of air conditioning.

**Drive without air conditioning as much as possible.**

Whenever driving without **passengers, turn the A/C OFF and roll your** windows down. This will prevent the vehicle overheating, and the A/C will be more efficient when **you need it for your passengers.**

**Before** shutting **off the engine, shut** off all lights and A/C, and let the engine run at a fast idle for approximately one (1) minute. This will help recharge the battery.

When you are in traffic and stopped, with your foot on the brake, place the gear selector in neutral **and bring the engine to a fast idle. This will help** cool the engine and allow the A/C **to cool more efficiently.**

### **DO NOT** DRIVE AN OVERHEATED VEHICLE

### IN EVENT OF AN ACCIDENT

"Accident" includes injury to patrons boarding, alighting, or while within the vehicle, even when a traditional accident (i.e. collision) has not occurred.

Revised 11/1/95

Stop and remain at the scene. Notify the dispatcher immediately. **THIS IS A MUST** regardless of how minor it may seem to you or what the other parties may do or say. The dispatcher will notify a supervisor and, if required, the police, paramedics, etc.

**DO NOT MOVE YOUR VEHICLE** unless instructed to do so by police or hotel security.

Render help to the injured only to protect them from further injury.

While waiting for assistance make no statements; admit no guilt. Immediately get the license plate number and state of issue of the other involved vehicle(s). Then exchange driver license information.

Try to get your passengers to stay at the scene until a supervisor arrives, **Ask them to complete witness cards, After the supervisor interviews them, he** will arrange for their transportation, If they insist on leaving, get their names and addresses and the hotel at which they are staying along with the room number, if appropriate,

**Upon returning to the Company Station, you must complete an accident** report. This **report must be reviewed and approved by a supervisor before you** may return to work.

You are responsible for unreported damage to your vehicle.

NO ACCIDENT OR INCIDENT IS TOO MINOR TO REPORT IMMEDIATELY

## GENERAL RADIO AND DISPATCH PROCEDURES

The radio is for business purposes only. Keep transmissions as short as possible. The dispatcher will not relay personal messages to drivers except in an emergency.

Cooperation with the dispatcher is half the battle. We require your full cooperation. No driver may refuse a reasonable order from a dispatcher, Do not argue with a dispatcher, Problems between dispatchers and drivers should be brought to a supervisor's attention,

Call "in-service" before you leave the Company Station,

Advise the dispatcher whenever you will be out of your vehicle, even for short breaks.

14

Revised 11/1/95

Call "out-of-service" and await dispatcher permission to bring your vehicle to the company Station.

CHECK IN WITH THE DISPATCHER HOURLY WHEN ON CHARTER.

During orientation our number designations will be discussed and you will be provided with a list of these designations. These designations are also listed on pages 26 and 27 and should be memorized.

## TRIP SHEETS, WORK ORDERS AND VOUCHERS

During your orientation, considerable time will be spent explaining bookkeeping procedures. This is an important part of your job. Accurate record keeping is essential.

Do not falsify a trip sheet. This is considered an act of dishonesty for which you could be terminated.

All trip sheets and work orders must be complete in every respect. In general, the more information you can provide the better.

At the start of your shift, obtain your trip sheets and vehicle keys from the dispatcher. Remember to return the keys **at the end of the shift.** Fill in all necessary information. Be sure to note your "OUT" odometer readings.

Remember to time-stamp all trip sheets **at** START AND END of each shift, A properly stamped trip sheet is important for your bonus, health and welfare, vacation, etc.

Safety check your vehicle and check the appropriate space on the trip sheet.

During the shift make sure your trip sheet is neat and current,

At the completion of your shift:

Before you leave your vehicle, be sure you have "IN" odometer readings.

Double check all your arithmetic and make sure it is correct and complete. This is as much a part of your job as driving.

15                                                Revised 11/1/95

Turn in as many large bills as possible, no more than 4 ones and 5 fives. No more change than needed. Hundred dollar bills are greatly appreciated. You must deposit the exact amount of money. If your turn-in is $149.90, do not deposit $150.00.

Place all money (cash and checks) neatly in a transparent envelope with a cash slip; be sure that the cash slip can be read through the envelope. Arrange the money by denomination, facing the same direction. Carefully drop this envelope down the chute at 2030 Industrial Road. 100 Sunshine Jan

Drivers are responsible for checks which have not been cleared by the Company.

For each service, separate trip sheets and paperwork (vouchers, work orders, etc.); place each set in a separate envelope. (making sure your name on the trip sheet is visible). Drop these into the appropriate slot in your drivers' room at 1 900 Industrial Road.

If service which would normally take an hour is billed for more than an hour, write an explanation on the work order.

You may use any color ink except RED on your trip sheet. Do not use pencil. .

Frequently, the first impression of an employee is the book work he turns in. Inaccuracies, sloppiness, etc. in this area reflect negatively on your overall evaluation,

## MONETARY RESPONSIBILITIES

You are responsible for collecting and accounting for all monies due to the Company, All money must be turned in daily, at the end of the shift, except in the case of out~of4own trips (see below). Any irregularity must be reported to a supervisor immediately,

On a cash order, you may ask the customer for a deposit or prepayment.

On "collect room or master account" orders, an authorizing signature must be obtained from the customer and the monies must be collected and turned in.

In the event that a client has established credit with the Company, you must be sure that there is sufficient information, authorization, and/or vouchers so that the Company can collect the monies due.

16

Revised 11/1/95

You may not leave on a trip of more than 1 50 miles (approximately) for which cash is expected without first depositing the full fare amount at the Company Station. A driver who will be out of town more than one day, must call the dispatcher every morning at 1 ~8OO~274~7433. At the end of a trip which terminates outside of the city, you must return to Las Vegas as quickly as practicable.

**Exceptions to the above cannot be made by anyone other than the management and they must be made for each occurrence.**

**You ARE NOT permitted to draw any money from your book. Any shortage from your daily book will be considered an act of dishonesty. Any driver who fails to** turn in his book and trip sheet (including all required documents) at the completion of his shift **may be terminated.**

Occasionally, you will **be required to** stock your vehicle with refreshments or buy fuel when you are on a lengthy trip. Whenever you make ANY expenditures **for which you expect to be reimbursed, you must turn** in the appropriate receipts.

<u>LUGGAGE</u>

Drivers must not charge for luggage. To do so is a serious violation and could be cause for termination,

A passenger, requesting per capita service, with an excessive amount of luggage, an amount **which would preclude accommodating additional passengers,** should be referred to the dispatcher or airport starter for charter information.

Check luggage for damage before loading, and point out any damage to the customer.

It is to **the driver's advantage to** verify **luggage ownership both before** loading, and after unloading (ask the customer). Take time while unloading; with proper care, there should be no lost, misplaced, or damaged luggage. Ask, at the time of unloading, if everyone has their luggage. Verify before you leave.

REPORT ALL PROBLEMS WITH LUGGAGE IMMEDIATELY!

17

Revised 11/1/95

## SERVICE AND FARES

### General

You **MUST** charge the approved rates in effect. Be sure to know current rates for each of the distinct types of service described below. There are no additional charges. Fares charged in excess of the correct amounts, or service provided other than that described herein, will result in termination.

Our Public Service Commission Certificate does not just authorize us to provide service, it obligates us to provide service to any orderly patron. Refusal could cause us to lose our certificate. A driver found to have refused lawful service **or to have discouraged a prospective customer may be terminated.**

### Airport Transfer Service

### General

Service is per capita and must begin or end at an airport and begin or end at a hotel/motel,

Drivers should be conversant with services offered by our charter limousine and bus services, Customers requesting service no available in airport service should be advised of them, or referred to a dispatcher or supervisor.

The maximum number of passengers (excluding the driver) permitted are as follows:

| | | | |
|---|---|---|---|
| Sedans | 5 | 8-Pax | 8 |
| Stretches | 6 | Buses | 20 |

There may never be more passengers on the bus than there are seats. The maximum number on a bus is 20. There can be no exceptions.

We want to operate with a maximum of efficiency and with a minimum of delay. Maximum waiting time:

| | |
|---|---|
| 1 passenger | 8 minutes |
| 2 or 3 passengers | 5 minutes |
| 4 passengers | 3 minutes |
| (immediate departure if ample vehicles are available) | |
| 5 or 6 passengers | immediate departure |

18                                                         Revised 11/1/95

<u>Passengers – at the Airport</u>

Load at the designated loading area.

Drivers of vehicles in the loading area must remain with their vehicles and **May not enter the terminal building unless requested to do so by a supervisor or** Dispatcher.

**These drivers must wear their hats. They may not smoke,** eat or drink, and must **remain at the side of the vehicle.**

**Customers will be loaded in the order they approach the vehicles (first come,** first served), Picking **loads, refusing or discouraging customers will not be** tolerated. Those seated in the vehicle or who have committed themselves to our service will not be asked to **unboard or wait for another vehicle.**

**To avoid duplication of** routes thereby increasing efficiency and providing better service, passengers may be grouped by destinations. This may be done only when sufficient vehicles are available.

Soliciting customers in any manner is strictly forbidden.

<u>Passengers – at the Motel/Hotel</u>

**Cooperate** with **employees of the establishment, Do not block traffic,** or interfere with **the doormen, or parking attendants, Set luggage on the curb,** as close to the entrance as possible. Do not carry luggage into, or out of, an establishment. Do not solicit passengers. This is a serious offense.

**Conduct yourself as a professional at all times.**

Try to determine if a **potential customer has ordered a car. A fellow driver might have been dispatched to answer the** call. Listen **to your radio; cooperation** in this area **will result in better conditions for all drivers and increase the efficiency of** our service.

When unloading passengers at the airport, do so in the commercial unloading zone as near to their airline as possible. When reaching your destination, caution your passengers to not open their doors into traffic congestion. Be sure all doors are closed before unloading luggage.

Revised 11/1/95

## Charter Limousine Service

This is our charter service which permits us to take customers between hotels, to wait for customers, or, generally, to transport them at their direction.

Charters are dispatched **by seniority whenever possible.** Also, when possible, by seniority, drivers will be given their choice of charters for approximately the same time.

DRIVERS MAY NOT PASS CHARTERS. Exceptions MAY be made on a case-by-case basis with dispatcher approval.

**At the end of your shift, you may ask to be relieved. You may not leave a** charter until your relief arrives.

Dispatchers will do everything possible to assign charters equitably. However, efficient service to the customer will always be the determining factor concerning which driver is dispatched on a particular order.

Charter drivers may be in the terminal only when meeting a specific flight. At these times they must be at a gate or baggage carousel and they must wear coats and hats. DO NOT LOITER AT THE BOOTH.

Charter drivers may not eat, drink or smoke when in the loading areas. Also they must stand at the side of their vehicles. The #1 position is for immediate departure. A charter driver in the #1 position should not begin loading until his party is ready to depart.

Following is a list of hotels at which limousines are stationed:

Driver/coordinators and several other drivers are assigned to these hotels. When other drivers are dispatched to support those stationed limousines, they are to cooperate with, and take direction from, the driver/coordinator (who has supervisory authority) and the assigned drivers.

Revised 11/1/95

## Mini-Bus: Special Services

Special Services is the transportation of a group, having exclusive occupancy of the mini-bus, on a per-capita basis, between points in Clark County. We must **collect for a minimum of I 2 fares for each trip. We can carry a maximum of 20** passengers in one bus at any one time.

**Fares are, per person, one way, in either direction.**

Public Service Commission rules require that for each Special Services trip, **there must be on the bus a work order stating:**

- **the point of origin**
- **the destination**
- **the route to be traversed the approximate mileage**
- **the name of the person, group or organization**
- **the date of service.**

**The Company may require additional information to be kept.**

Drivers **must understand the distinction between "Special Services," as** described **above, "Charter Bus" Service (below), and "Airport Service" provided by** bus. If it is not clear, consult management personnel,

## Charter Bus Service

This service allows us to charter buses to groups, within Clark County **(maximum 20 passengers per bus). We** can **take the group** between hotels, to and from the airport, wait for them, or, generally, transport them at their direction.

As with charter limousines, the charter group is entitled to the exclusive occupancy of the bus.

**The charge for a bus charter is an hourly rate. There** is no per-capita charge under this service, only the hourly charge.

You must understand the distinction between a "Charter," as described above, and "Special Services" and "Airport Service" provided by bus. If it is not clear, consult management personnel.

Revised 11/1/95

BELL TRANS does not conduct scenic tours.

Public Service Commission rules require that for each Charter Bus trip, there must be on the bus a work order, stating:

- the point of origin
- the destination
- **the route to be traversed**
- the approximate mileage
- **the name of the person, group or organization**
- the date of service.

No mini-bus charter may leave the State of Nevada. No exceptions.

## GENERAL RULES AND REGULATIONS

All applicable laws and the Regulations of the State of the Nevada Public Service Commission must be adhered to by all employees.

You must have a CDL (Commercial Drivers License) to drive a mini-bus. Driving a mini-bus without a valid **CDL is prohibited and** will result in termination.

There must be no alcohol or drugs of any kind taken prior to or during your shift. If a supervisor suspects a driver of having ingested alcohol or drugs he may require that the driver undergo blood alcohol and urine tests. Costs for these will be borne by the Company. Refusal to take such tests will result in termination. Positive results will result in termination. There is zero tolerance concerning these matters.

Cooperation with or acquiescence to an illegal activity engaged in by your passengers, including but not limited to alcohol consumption by minors, is of extreme seriousness and will result in your termination,

Any act of dishonesty will result in immediate termination.

Gambling while on duty, including breaks is absolutely prohibited.

Be courteous at all times. Do not engage in arguments with your customers or the public. If you have a problem, notify the dispatcher to have a supervisor meet you to resolve the problem.

Vehicles are to be used only to pursue Company business, Personal use is prohibited.

Authorized persons only are allowed in body shop and garage areas. You may not loiter in the shop area, or dispatch area. Whatever business you have in those areas, is to be conducted in the shortest possible time. Do not walk through the shop to get from one side of the building to the other. A drivers' room is provided for your convenience.

**No weapons, including pocket knives, may be carried or kept by the driver on his person or in the vehicle at any time.**

You must report to work at least 1 5 minutes prior to the scheduled starting time of your shift. A shift is 8-1 /2 hours from the start of the shift time (includes 1 /2 hour for lunch). You must work a complete shift and, when requested to do so **by a dispatcher, must make every effort to extend your shift.** Early check-ins will be permitted for **illness or emergencies, for which proof may be required.**

**You must** call in service at the Company Station. Unless requested to begin work early, you may not start work earlier than 1 0 minutes before your assigned time. You may not stand by at hotels, or leave the Company Station until you start your shift. Exceptions, such as taking a car to a commercial carwash, must be **approved by a dispatcher.**

If requesting an extra day off, you must receive permission from a supervisor no less than two hours prior to the starting time of your shift. Additional days off will be **granted at the discretion of the supervisor. Disciplinary action** will be **taken for excessive absences. An employee calling off due to sickness or emergency may** be required to submit acceptable proof.

All articles found in the vehicle must be turned in to a supervisor or dispatcher. Tape a piece of paper to the article with **your name and the date found.** All rewards will be **returned to you. If not claimed** within **30 days, you may have** the article. **You** will be terminated for failure to turn in a found article.

Customer complaints are taken very seriously by this Company. Abuse of a customer may result in termination.

While on duty, you must have a current map book or street guide in your possession.

23

Occasionally collections are taken up for the benefit of a fellow employee. While such activity is worthwhile, the Company cannot become involved in any manner.

# SUGGESTIONS FOR A PROFESSIONAL DRIVER

Tune your AM/FM radio to an "easy listening" music station. You may have different tastes in music or prefer the news or a ballgame. However, wait for your customer to request another station. Naturally, when you have no one in your vehicle, you may choose any station.

If you smoke, do not do so when you have customers in the vehicle, or when in the loading area of the airport. Also, do not smoke in the vehicle unless all Windows are completely open. People are increasingly health conscious and this courtesy is greatly appreciated. Cigar and pipe smoking is prohibited in a Company vehicle.

We are developing a demand for limousine service for weddings, anniversaries, proms, etc. Always be aware that these charters are extremely important and should be treated accordingly.

If you are driving a "stretched" limousine, take time at the beginning of the charter to introduce yourself and ask if you can explain how to operate the amenities.

Respect your customers' privacy. Do not discuss particulars of a charter with anyone.

Always be prompt - tardiness not acceptable.

When you have a break during a charter or between the airport transfers, inspect your vehicle. Whenever a customer gets into your vehicle, it should appear that this is your first **order. Empty ashtrays frequently during your shift; remove** empty glasses and restock and arrange the bar; etc.

You may not solicit a tip in any way. Be courteous, and accept any tip the passenger may choose to give you. You must offer to the passenger the correct amount of change. Your tip is that amount which the passenger offers. You may not assume that any money over the amount of the actual charge for service is yours unless the passenger explicitly indicates that such is the case. Do not discuss a tip with the passengers. Ask the dispatcher concerning approved percentage tips added to the bill.

24

When a percentage tip is added to a charge and a customer offers a cash tip, be sure it is clear that the cash tip is in addition to the percentage tip and not in lieu of the percentage tip.

## REMEMBER YOU ARE A PROFESSIONAL AND SHOULD CONDUCT YOURSELF WITH PRIDE

### <u>UNION</u>

For collective bargaining purposes, you are represented by Local 71 1 -A of the United Steelworkers of America. The Company and the Union have entered into a collective bargaining agreement which governs wages, hours, and other terms and conditions of your employment. You will be provided a copy of the current contract along with this Handbook. Become familiar with it; if you are uncertain as to the meaning of any provision of the contract, consult your supervisor or the General Manager.

Under federal and state law, you are free to join or not join the Union. You cannot be discriminated against, by either the Company or the Union, in any manner, because you do or do not belong to the Union. You cannot receive any better Company benefits because you belong to the Union; you cannot receive any better Company benefits because you do not belong.

By law, you are entitled to be free from intimidation or coercion in your choice to accept or refuse Union membership. If you believe you are being subjected to coercion or intimidation either to join the Union or to not join the Union, you should report such activity to the Las Vegas office of the National Labor Relations Board.

Revised 11/1/95

# EXHIBIT C

# DRIVER'S RULES & REGULATIONS
# BELL LIMO/AIRPORT MINI-BUS

1. When you come into work you are expected to be on time and neatly dresssed. As a Professional Driver you will be expected to drive at a higher standard of safety than most other drivers do. You must treat driving as a number one priority .keep your mental focus on your driving. Any activity which might distract your eyes off the road, such as using a cellular phone, adjusting the radio, reading your dispatch terminal, checking your map book, etc...Should be done with extreme caution .ideally when you're not moving. Please drive safe and secure. .

2. Our Dress code is as follows: Airport mini-Bus drivers will be required to wear a black suit with matching black pants, solid blue dress shin, black tie, and black (closed-toe) shoes. Optional clothes include black vest, black overcoat, black or clear raincoat, black or clear cap cover, black or white gloves. Bell Limo drivers will be required to wear a black suit with matching black pants, solid white dress shirt, black tie, and black (closed-toe) shoes. Optional clothes include black vest, black overcoat, black or clear raincoat, black or clear cap cover, black or white gloves. Drivers must come to work neatly groomed and clean shaven. Hair must be kept neatly trimmed arid no longer than collar length for male drivers. Female drivers will have hair pulled back and fastened up so that it is off the shoulders.

3. Your personal car is to be parked in the south parking lot or along the curb on the West Side of the street. Always lock your car. Please don't park in front of the Business Office or on the fence on the East Side of the street: that is reserved parking.

4. Check in/out: Report to the dispatch office for check-in and get the keys to your vehicle and your Airport! Limo trip sheet. You should not loiter in the Driver's Safe Room. If you have to wait for someone, please wait in the driver's lunchroom. At the end of your shift, close all the windows, lock the vehicle and hand the keys to the dispatcher. DO NOT LAY THE KEYS ON THE COUNTER OR IN THE WINDOW. During your shift, do not leave the trunk keys in the trunk and always remove the keys from the ignition before leaving your vehicle unattended.

5. Your Vehicle: It is your responsibility to insure that your vehicle is CLEAN inside and out. Daily cleaning of the vehicle's body, windows, carpet, seats and dash will normally pay off with better tips. After every trip empty the ashtrays and check the interior of the vehicle. At the end of the shift, the interior of the vehicle must be left clean and ready to go and all personal items should be removed. If you receive a dirty vehicle write it up on a "check-out" form.

6. Vehicle Inspection: Before taking your vehicle off the lot, check it for damage and complete a Vehicle Inspection Report (available in the dispatch room). If there is damage,

complete a Damage Report Form and hand the form to the dispatcher at the beginning of your shift. These forms are for your protection. Also, before leaving the lot, insure that your vehicle has an accident packet and a safety kit.

7. Spare tire Jack & Jack handle & Ties: Before you leave the lot, check your vehicle for jack handle, jack and spare tire. The spare tire is for the company vehicle use only. If you have a flat, replace it with the spare and proceed immediately to the shop to have your tire repaired or replaced.

Be sure that your trunk is kept clean and leave the jack handle properly stored, not under the front seat.

Do not take the vehicle off the lot if the tires do not have legal tread of 4/32" front and 2/32" rear.

All gas persons have a tread measurer. Remember that you are responsible for any citations that

Airport Mini-Bus/Bell Limo receives on your vehicle for equipment violations.

During the winter months, you must also have a set of chains, chain tighteners, extra chain links and wire. If a chain link breaks stop immediately and wire it up. Undue chain damage will be charged to the driver. If you haven't driven in winter conditions such as those in the Reno area and will need instructions on how to install, maintain and remove your chains see the business office and sign up for the next chain class.

8. Trip Sheet (if you have problems with filling out your trip sheet see Brad or Chip): Please keep your trip sheet neat and legible. City ordinance requires you to show your pick up point, time, and number of passengers, final destination, time and amount. You may use a place of business or physical address. Never use red pen or red pencil on your trip sheet.

9. Odometer Reading: list odometer readings (All digits) on your trip sheet at the beginning of your shift. At the end of your shift take all the readings again and record the difference. Should you use a second car there is space for odometer readings for two cars on each trip sheet. If you use a third or fourth car turn your trip sheet over and list the in and out readings at the bottom of the page. Total all your readings and put them on the front of your trip sheet.

10. Cash Turn-in: Before coming to the gas pumps, you should change your small bills into fives, tens and twenties. Your cash turn-in should not include over $4.00 in ones or over $1.00 in change. We will not accept any foreign currency, chips, tokens or silver dollars.

11. Dropping your "book": Before you drop your "book" in the safe you should fold your trip sheet in half with

your name on the outside. Place your charter slips, unfolded, inside your folded

Airport/Limo trip sheet, then fold your trip sheet again, keeping your name to the outside. Put your money, unfolded, charge coupons and any receipts inside the quartered trip sheet. Then, insert them in the plastic check-in bag and drop in the safe. Be sure your bag drops when you insert it in the safe. You are responsible for your "book".

12.   Charter Slips: Charter slips must be filled out completely by the driver. Beginning mileage must be entered on the charter slip when you depart the terminal, and the ending mileage must be entered when you arrive back at the terminal. If you have more than one charter before returning to the terminal, the mileage will be divided between the two charters. The miles listed for each charter must agree to the total miles while gone.

13.   Charters: When arriving back at the airport from a charter, if the arrival time differs from the TIME IN on your charter, you must write an explanation on the back of your charter slip. If you run a charter on a charge and the trip runs more than the normal running time, we would like an explanation on the back of the charter slip.

14.   Hotel Charters: When on a hotel charter, it would be beneficial to check with their transportation department for additional work. Also, if their guests wish to deviate from the original trip, you must call and get prior authorization before proceeding. If the hotel refuses any extra time, the additional amount is the responsibility of the passenger(s).

15.   Personals: When drivers have out-of-town personals, it is the driver's responsibility to call and confirm trip before departing the terminal.

16.   Charter Assignment: Charters will be assigned to the "first-out" empty vehicle, except driver's personals or special customer requests. The business office may assign advance reservations. Dispatchers are required to notify the "first-out" driver of the reason for the deviation. If a reservation is made for a requested driver, that driver will be offered the trip. If the driver is unable to service the personal trip, the "first-out" empty vehicle will be assigned the trip or it will be assigned by the office.

17.   Return Reservations: Any driver who takes a return reservation from a passenger will have the dispatcher write it up as soon as the driver arrives back at the terminal. The driver must get all the information including the fill name of the party, date and time of pickup, exact location of pick up and telephone number where the party may be reached to confirm the reservation. The information must be documented even if it is for a "personal".
shift consists of nine (9) hours with a maximum of twelve (12) hours

19.   Absences/Tardiness: You are expected to show up on time for work. If you have a legitimate absence, you may request to work a "make-up" shift on one of your regularly scheduled days off if you are ill or will be tardy during business hours, please call the office (786-3700) one (1) hour before your shift begins. Outside of business hours, contact the dispatcher at the Airport first, then if no answer, call Whittlesea dispatch at 323-0503 in order to notify someone of your illness/tardiness.

20. Changes to work schedule: Drivers requesting extra time off or wanting to work an extra shift must complete a "time off/extra work request" form and submit it to the business office for approval. Forms are available at the dispatch desk or in the business office. All requests for vacation time must be submitted on a "Vacation request" form at least twenty (20) days in advance. If there is any conflict with the dates requested, vacation requests will be honored in the order in which they were received.

21. Changes in personal information: Drivers are required to submit to the business office any change of address or telephone number within 15 days of change.

22. Driver Requirements: Drivers must keep their drivers license, Reno permit, and physical current. After renewing your driver's license and/or Reno permit, bring them to the business office so that the renewals can be recorded. When renewing your physical, the long form must be completed for your personnel file. If you have a Class B or C license, bring your physical form to the business office and we will make a copy of it so that you may take the original to the DMV. Drivers with a commercial driver's license need to know the Federal Motor Carrier Safety Regulations number 374, 382, 383, 390, 392, 395 and 399.

23. Delays: Advise the dispatcher of any delay in meeting the pick-up time so that another vehicle can be dispatched if necessary.

24. Disallowed activity: Never allow a passenger to operate your vehicle or two-way radio at any time. You are responsible for the vehicle and equipment at all times.

25. Radio: All radio messages must be kept as short as possible. Long messages should be done by telephone.

26. Busy dispatchers: Dispatchers will give a series of clicks on their microphone to indicate they are busy on the telephone or with customer sat the counter. Drivers will not use their radio after this series of clicks until the dispatcher announces that the air is clear.

27. No loitering: Drivers may not loiter in the vehicle lot area or the shop. The only time a driver is allowed in the shop area is to bring their vehicle in for repair or cleaning. If you need to see a mechanic or gasman go into the lunchroom and ring the buzzer. There is also no loitering allowed at the airport, in the terminal or at our airport counter. The "first-up" stretch driver is the only exception, as she/he will assist the dispatcher and customers. VIOLATION OF THIS RULE IS GROUNDS FOR TERMINATION.

28. Lost and found: Check your vehicle after discharging passengers. If any item is left in your vehicle, try to return it immediately if possible. If not, turn it in to the office. If the business office is closed, turn it in to the Whittlesea Dispatch office. ALL items found must be labeled with driver's name vehicle #, date and time it was found.

29. Smoking: Smoking is not considered professional behavior while a passenger is in the vehicle.

30. Prescribed medication: You may not drive if you are taking any medication unless you contact the business office and receive permission. If it is a prescription, you must have a note from your doctor stating that you are able to drive while taking the prescription.

31. Out-of-town trips: On long out-of-state trips, when you are clear, call our toll free line at 800-235-5466 during business hours. After hours and for long out-of-town trips within the state, call collect. Advise the person taking the call at what time you will be returning.

32. Extended local trips: On extended charter trips, you must call in every hour. Never let it go more than two hours. This is for your safety.

33. Fuel: The vehicle will be fueled at the end of each shift at the Whittlesea gas pumps, except if clearing back from an ICC trip. The gasman will enter the gallons on your trip sheet and have you sign for the fuel. Look at the pumps and be sure you are signing for the proper amount. If you run short on fuel on Nevada trips, buy just enough fuel to get back to Reno. DO NOT FILL THE TANK. Get a receipt for the fuel and turn it in like cash, with a note explaining why you had to buy gas. Gas receipts must show the name of the station, location of the station, gallons pumped, price per gallon, and total dollars. RECEIPTS NOT CONTAINING ALL OF THIS INFORMATION MAY BE REJECTED. Driver's name and number should also be written on the receipt.

34. Local Accidents: When you are involved in an accident or incident, do not move your vehicle until told to do so by a Supervisor or Law Enforcement Officer.
The procedure to follow when involved in an accident or incident is:
First thing, no matter what, get the license number of the other car. Advise dispatcher if you have a passenger and/or injuries.

Obtain other driver's name, address, telephone number, driver's license number and insurance company and agent (forms are in the accident kit).

Get make, model, color, license number and state, and approximate extent of damage to the other car. Obtain names, telephone numbers of any witnesses (forms are in accident kit).

Get the names, telephone numbers and addresses of any passengers, whether injured or not. If they are tourists find out where they are staying and how long they will be in the Reno area.

Do not admit any liability or try to blame the other driver. Just give the statement of facts to the investigating Police Officer. Give your opinion to your supervisor when you are alone with him.

Do not move any injured person. Let the police department take care of them. Dispatch will tell the police department if an ambulance is needed when you notify them of any injuries.

35. Out-of-town accidents: If you are involved in an accident or incident out-of-town follow these procedures:

First thing, no matter what, get the license number of the car.

Do not move your vehicle until instructed to do so by a Law Enforcement Officer.

Take out your accident kit and follow the instructions.

If there are injuries, immediately call your dispatcher collect so an insurance adjuster may be assigned to the scene.

As soon as you arrive back in Reno, contact your Supervisor and have your accident report and witness statements reviewed.

36. Bodily injuries: On any accident involving damage or bodily injury due to negligence of the driver, the driver will be charged up to and including the first $500.00 of such damage. This charge may apply if the driver moves the vehicle and makes the accident scene unable to investigate.

37. Failure to report an accident: Any driver failing to report an accident will be subject to termination and will be charged full cost of the accident.

38. Nevada State Driver's Handbook: All drivers will read the Nevada State Driver's Handbook, and be required to observe all traffic laws. Drivers may be discharged for three moving violations in a twelve month period.

39. Safety meetings: As a condition of employment, drivers may be required to attend safety meetings as well as a meeting regarding the American Disabilities Act.

40. Recommendations: If asked to recommend a hotel, motel, or restaurant, you should name three choices and then allow the customer to decide.

41. Mechanical problems in Las Vegas: If you have mechanical problems or need assistance of any kind while in the Las Vegas area, you may call the Bell Trans dispatcher at 739-7990. After you clear, go by and have your limo checked out by their shop before returning to Reno. The address is 1910 Industrial Road, Las Vegas.

42. Passenger limitation: Our Nevada operating authority restricts us to a maximum seven passengers in addition to the driver in a stretch limousine and is strictly enforced. Drivers are not allowed to "deadhead" other drivers, friends or family members in the vehicle.

43. Luggage: When loading passengers, have them confirm before entering the vehicle that they have all theft luggage. When unloading passengers, again ask them if they have their entire luggage. In the event they have lost a bag, notify the dispatcher immediately, giving

a full description of the luggage. If you have any lost or damaged luggage, you must submit an incident report before going off shift.

44. Solicitation: Drivers will not solicit passengers from the taxi line or openly solicit persons exiting the terminal. Drivers are also not allowed to have personal business cards without prior approval from a Supervisor.

45. Vehicle Parking: Vehicles may not park in taxi zones or Citifare bus zones for any reason.

46. Office visits: Drivers coming to the office must stop in the front area of the office and ask permission to proceed to the back office.

47. Paydays: Paydays are every other Wednesday at the Whittlesea office window. Drivers may pick up their paychecks after noon on paydays.

48. Tickets: You are responsible for any Parking Tickets you receive.

49. Alcohol/Non-prescribed drugs: Drinking any alcoholic beverage or taking any non-prescribed drugs while on shift may be grounds for immediate termination. This includes your lunch break. If we suspect that alcohol has been consumed, you will be required to take a breath test. If you fail the test or refuse to test you may be subject to termination.

50. Breaks: You are allowed a one-hour break during the course of your shift. No breaks will be allowed during the first two hours or the last two hours of your shift. If there are too many drivers out to lunch or we are too busy the dispatcher may ask you to wait for your break.

51. Dispatch Office: Drivers are forbidden to be in the dispatch office except for handling company business. It is important to remain soft-spoken and not use profanity.

52. Driver Protection: A driver may not carry guns, switchblade knives, or other weapons. Jack handles or lug wrenches may not be carried in the passenger's compartment of your vehicle.

53. Notifications: Drivers should read the bulletin boards and blackboards daily.

54. Gambling: No gambling on duty .this includes your lunch breaks.

55. Tips reported versus tips charged: We recommend you turn in your monthly record of tips at the beginning of each month to the business office so that we can take income tax out for you. Your charged tips are not automatically taxed.

56. Parking of vehicle: Do not park in front of the main office door, the driver's lunchroom, or the drivers' safe room. This is the entrance/exit from the lot. If you have any business at the office, please park in a legal parking space.

57.   Loading/unloading passengers: When pulling into off-street parking to load or unload passengers, park in a legal parking space. You are not allowed to use Handicapped Parking spaces for any reason.

58.   Worker's Compensation Claims: Effective July 1, 1995 the legislature changed the time limit for reporting an accident for workers compensation claims. The new time limit is 7 days and was previously 30 days. If you have an on the job injury and wish to report it as an Incident for record purposes only, you will have to use C-I form. If medical treatment or lost time is anticipated at the time of the injury use the employer's first report of accident form, the C-3. Failure to report within 7 days on either the C-I or C-3 form may result in loss of Worker's Compensation Benefits. Filing either the C-1 or the C-3 form within the 7 day time limit satisfies the reporting requirement.

59.   Other rules and regulations: Rules and regulations for the Reno-Tahoe International Airport and the Reno Hilton hotel are provided to you on separate sheets. The Airport Authority and the Reno Hilton respectively, established these rules so please abide by them. Failure to do so may result in termination.

60.   The first six (6) months of regular full-time employment shall, for each employee, be a probationary period. At its discretion, the Company may extend the probationary period by not more than three (3) months, on a case-by-case basis. During his/her probationary period, each employee is subject to discipline as the Company, at its unlimited discretion, deems proper, and grievance on his behalf may not be instituted.

The employer may require employee applicants and probationary employees, as a condition of employment or of continued employment, to execute, in partial consideration for his employment or continued employment, an agreement that during his probation period his employment shall be "at will," that the employment relationship may be termination by the employer, except in violation of statute law, the employee shall have no action for damages.

# EXHIBIT D

Mark R. Thierman, NV#8285 CAL#72913
**THIERMAN LAW FIRM, P.C.**
7287 Lakeside Drive
Reno, Nevada 89511
Tel: (775) 284-1500
Fax: (775) 703-5027

Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ANTHONY LUCAS, GREGORY H. CASTELLO, LILLIAN MELTON, LEAVON R. SMITH, ROBERT A. GREENE, JAMES A. BIGGS, LARRY DUTCHER, WILLIAM C. SACK, DONALD A. SPEARCE, MERRILL L. CLAIR, BRADLEY J. EDWARDS, and LISA MEDFORD on behalf of themselves and all others similarly situated, | Case No. 2:08-CV-01792-RCJ-RJJ |
| Plaintiffs, | **DECLARATION OF MARK R. THIERMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| BELL TRANS, a Nevada corporation; BELL LIMO, a Nevada corporation; and WHITTLESEA-BELL CORPORATION, and Does 1-50, Inclusive | |
| Defendants. | |

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net

Declaration of Mark R. Thierman

1

1 I, Mark R. Thierman, do hereby declare and state:

2       1.      The following declaration is based upon my own personal observation and
3 knowledge, and if called upon to testify to the things contained herein, I could competently so
4 testify.

5       2.      I am an attorney at law admitted to practice before the Supreme Courts of the
6 States of California and Nevada, all federal district courts in California and Nevada and the
7 United States Court of Appeals for the Ninth Circuit, the Court of Appeals for the District of
8 Columbia and the United States Supreme Court and am one of the attorneys of record for
9 Plaintiffs in this action.

10      3.      My background and qualifications are set forth hereinafter.  I received my
11 Bachelors of Arts (Magna Cum Laude, Phi Beta Kappa) from New York University in 1973,
12 and received the Founders Day Award, Mr. Justice Bloustein law award and the Adoph Ochs
13 Adler (NY Times) award for community services for instituting the pre-law student paralegal
14 program at Office of Economic Opportunity, Queens Legal Services, Inc.

15      4.      In 1976, I graduated from the Harvard Law School and was admitted to
16 practice in the State of California in December of that year.  Since 1977, I have generally
17 limited my practice to the area of Labor and Employment law, with an emphasis on traditional
18 labor law subjects like apprenticeship, overtime compensation, prevailing wage, Labor
19 Management (Taft Hartley) trust funds, and unfair labor practice litigation before agencies
20 like the National Labor Relations Board, the California Division of Labor Standards
21 Enforcement, the California and Nevada Apprenticeship Council, and various agencies with
22 the United States Department of Labor, such as the Wage-Hour Division, the Pension Benefit
23 Welfare Administration and the Bureau of Apprenticeship and Training.

24      5.      I have authored and co-authored books and articles on the topic of labor
25 relations law.  I am co-author of the book entitled "Lowest Responsible Bidder-A Guide to
26 Merit Shop Construction," and the content of "Safety Plan Builder," a software product
27 published by Jian with a 300-page book OSHA safety law.  I am the co-author of the chapter
28 in the CEB text "Advising California Employers" on workplace safety.  I have written many

1 articles that have appeared in both industry publications and the magazine for the Labor Law

2 Section of the California Bar.  In August, 2000, I have presented for one hour of MCLE credit

3 as a guest on overtime law on KBZS, 1220 AM radio program called "Legal InCite" with host

4 Peter Keenen, Dean of the Golden Gate University School of Law.

5      6.     Since 1995, I have been representing plaintiffs in white-collar class actions for

6 wage and hour violations.  Since that time, I was one of the attorneys for plaintiffs in some of

7 the largest class action wage hour settlements in California (at their time for that particular

8 industry).  See, e.g., *Kelly v. SBC, Inc.*, No. 97-CV-2729 CW (N.D. Cal. 1998), U.S. Dist.

9 LEXIS 18643, 5 Wage & Hour Cas 2d (BNA) 16; *Burns v. Merrill Lynch*, Case 3:04-cv-

10 04135-MMC; *Frankly v. Bank of America*, Case 3:05-cv-00519-CRB, among others.

11      7.     I have represented parties in many reported cases.  A recent LEXIS printout of

12 cases lists my firm or me as counsel in over 100 cases, not including numerous administrative

13 proceedings, settlements and other matters not recorded on LEXIS.  The most recently

14 reported case of significance is Judge Wilken's decision in both *Bahramipour v. Citigroup*

15 *Global Markets, Inc.* (N.D. Cal. Feb. 22, 2006, No. C 04-4440 CW), 2006 WL 449132, and

16 *Kelly v. SBC, Inc.* (supra).

17      8.     I have extensive trial and other courtroom experience in that I would estimate

18 that I have been, for the majority of my career, directly involved in handling, on average

19 between 2-4 longer trials per year, the number fluctuating depending upon whether

20 administrative law trials (such as those before the NLRB) are included in the count.

21      I have read the foregoing declaration consisting of this page and two others and

22 declare under penalty of perjury that it is true and correct.

23      Executed this 21st day of September, 2009.

24

25                                  /s/Mark R. Thierman

                                  Mark R. Thierman

26

27

28

THIERMAN LAW FIRM, PC
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email laborlawyer@pacbell.net www.laborlawyer.net