**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ANTHONY LUCAS, et al.,

Plaintiffs,

vs.

BELL TRANS, et al.,

Defendants.

Case No.: 2:08-cv-01792-GMN-RJJ

**ORDER**

This case arises out of the alleged failure of limousine companies to pay drivers for their labor preparing, driving, waiting with, and washing limousines. Pending before the Court are Defendants' Motion for Summary Judgment – FLSA (ECF No. 90); Defendants' Motion for Summary Judgment – State Law (ECF No. 92); and Plaintiffs' Motion to Strike (ECF No. 97). For the reasons given herein, the Court will deny Defendants' Motion for Summary Judgment-- FLSA (ECF No. 90); grant Plaintiffs' Motion to Strike (ECF No. 97); and strike Defendants' Motion for Summary Judgment – State Law (ECF No. 92).

## I. FACTS AND PROCEDURAL HISTORY

Defendant Whittlesea-Bell Corporation is a holding company for Defendants Bell Trans and Bell Limo (collectively, "Defendants"). The officers and directors of these companies are all, or nearly all, members of the Bell family. Brent Bell has been the President of Bell Trans since 2002. Larry E. Bell, Jr. has been the President of Bell Limo since 1999. Bell Trans operates in Las Vegas, and Bell Limo operates in Reno.

Defendants' drivers work 8-1/2 hour shifts. At the beginning of each shift, drivers must report to Defendants' vehicle yards to retrieve the keys from the dispatcher, prepare the

limousine, and travel to the airport, all without pay. Only time spent actually transporting customers is compensated. Time driving from fare to fare or waiting for fares is not paid, although the driver is required to be with the car during those times. Drivers are also required to wash limousines on their own time using their own funds, without pay, and they are fined if the vehicles are not kept clean.

On December 18, 2008, Plaintiffs Anthony Lucas, Gregory H. Castello, Lillian Melton, Leavon R. Smith, and Robert A. Greene filed the present lawsuit individually and on behalf of all persons who were employed by Bell Trans as limousine drivers within the three previous years. (*See* ECF No. 1). The Amended Complaint ("AC") added Bell Limo and Whittlesea-Bell as defendants, and it added Plaintiffs James A. Biggs, Larry Dutcher, William C. Sack, Donald A. Spearce, and Merrill L. Clair. (*See* ECF No. 36). Plaintiffs pled five causes of action: (1) failure to pay wages for all hours worked in violation of Nev. Rev. Stat. ("NRS") § 608.016 and failure to pay minimum wages under Nev. Const. art. 15, § 16 and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206; (2) failure to pay for overtime in violation of NRS § 608.100(1)(b) and the FLSA, 29 U.S.C. § 207(a)(1); (3) liquidated damages under the FLSA, 29 U.S.C. § 216(b); (4) waiting penalties under NRS § 608.040; and (5) improper wage deductions under NRS § 608.100(2).

Bell Trans filed a Motion to Dismiss (ECF No. 4) pursuant to Rule 12(b)(6). On June 24, 2009, the Honorable Robert C. Jones issued an order granting the Motion to Dismiss (ECF No. 4) as to Plaintiffs' state law claims for compensation under NRS § 608.100; for unpaid minimum wages under NRS § 608.250 or Nev. Const. art. 15, § 16; and for unpaid overtime under Nevada law. (*See* ECF No. 27). The Court held that there was no private right of action under § 608.100 and that Nev. Const. art. 15, § 16 did not impliedly repeal the statutory exception to Nevada's

minimum wage and overtime laws applicable to taxicab and limousine drivers. However, the Court denied the Motion to Dismiss (ECF No. 4) as to Plaintiffs' claims for unpaid wages under § 608.016 and penalties under § 608.040. (*See id.*). The Court also denied Plaintiffs' motion to certify the order for interlocutory review or to certify the question to the Nevada Supreme Court. (*See* ECF No. 58). The AC lists some state law causes of action that have already been dismissed: notably, the state law overtime and minimum wage claims. The only state law claims remaining are those for unpaid hours worked under § 608.016 and waiting penalties under § 608.040.

On December 1, 2009, Judge Jones certified two subclasses:

> Subclass (A): All current or former employees employed by Defendants in the State of Nevada as limousine drivers within the three years preceding the filing of their Complaint to the date of entry of judgment, who were not paid wages by Defendants for all hours worked in violation of Nevada Revised Statutes § 608.016.
>
> Subclass (B): All current or former employees employed by Defendants in the State of Nevada as limousine drivers within the three years preceding the filing of their Complaint to the date of entry of judgment, who were discharged and not paid within three days after the wages of compensation became due or who resigned or quit and were not paid on the day the wages or compensation became due in violation of Nevada Revised Statutes § 608.040.

(ECF No. 69 at 5:20–25, 12:14).

Subclass A consists of persons aggrieved by alleged violations of the following statutory provision: "An employer shall pay to the employee wages for each hour the employee works." Nev. Rev. Stat. § 608.016. Plaintiffs argue that requiring drivers to drive, wait with, prepare, and wash vehicles without any pay violates this provision of the code regardless of whether drivers are exempted from the minimum wage requirement.

///

///

Subclass B consists of employees aggrieved by alleged violations of the following statutory provision:

> 1. If an employer fails to pay:
>
> (a) Within 3 days after the wages or compensation of a discharged employee becomes due; or
>
> (b) On the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day he resigned, quit or was discharged until paid or for 30 days, whichever is less.

Nev. Rev. Stat. § 608.040(1)(a)–(b). This "waiting penalty" statute penalizes an employer's failure to render prompt payment of past-due wages to an employee who resigns, quits, or is discharged. Subclass A includes all current and past employees who have never been paid for certain work. Subclass A therefore necessarily includes all members of Subclass B, which is potentially smaller, consisting only of current and former employees who resigned, quit, or were discharged without having their unpaid wages paid to them promptly thereafter, making Defendants liable to these employees for thirty additional days of wages under the "waiting penalty" statute, § 608.040.

## II.    SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if

reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient

that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.   ANALYSIS

### A. Defendants' Motion for Summary Judgment - FLSA (ECF No. 90)

Defendants previously filed a similar motion for summary judgment in May of 2010, (ECF No. 80), but withdrew the motion in order to afford Plaintiffs more discovery before responding. (ECF No. 87). As a result, Plaintiffs withdrew their pending motion to stay. (*See* ECF No. 88).

#### 1.   Motor Carrier Act Exemption

In the present motion for summary judgment, Defendants argue that Bell Trans and Bell Limo are both exempt from the overtime pay requirements of the FLSA under the Motor Carrier Act. *See* 49 U.S.C. § 31502. However, Defendants are only correct as to pre-August 10, 2005

activity. Defendants are no longer exempt from the overtime pay requirements set forth in the FLSA due to a series of amendments to the Motor Carrier Act passed in the mid-2000s.

The U.S. District Court for the Northern District of Georgia addressed this issue in a substantively similar case in 2008, *see Vidinliev v. Carey Int'l, Inc.*, 581 F. Supp. 2d 1281 (N.D. Ga. 2008). That court's resolution of the issue is thorough and persuasive. The plaintiffs in *Vidinliev* were limousine drivers who often worked over forty hours per week without overtime. *Id.* at 1283. They filed suit under the FLSA, 29 U.S.C. § 207(a)(1), for failing to pay overtime. *Id.* The defendants argued that as "motor carrier[s]" they were exempt from the overtime pay requirement under § 213(b)(1). *Id.* at 1283–84. The *Vidinliev* court noted that "under the motor carrier exemption, the overtime pay requirement does not apply to 'any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act [of] 1935.'" *Id.* at 1284 (quoting 29 U.S.C. § 213(b)(1)).

The Secretary has jurisdiction to prescribe "qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier." 49 U.S.C. § 31502(b)(1). The Motor Carrier Act limits the Secretary's jurisdiction in relevant part as follows:

> The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier--
>
> (1) between a place in--
>
>       (A) a State and a place in another State;
>
>       (B) a State and another place in the same State through another State;

49 U.S.C. § 13501.

The Department of Labor has codified a two-part test to determine if an employee is exempt from the overtime pay requirements of the FLSA, based on its interpretation of the statutes and case law. An employee is exempt if (1) the employee is employed by a carrier whose transportation of passengers by motor vehicle is subject to the Secretary of Transportation's jurisdiction under 49 U.S.C. § 31502; and (2) the employee is engaged in activities affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce. 29 C.F.R. § 782.2(a) (2010). The *Vidinliev* court found that the defendants in that case satisfied the test for exemption.

First, the court found that they easily satisfied the first part of the test because the employers provided evidence of permits or licenses issued from the Department of Transportation ("DOT"), which was sufficient to prove the Secretary's jurisdiction over them. *Vidinliev*, 581 F. Supp. 2d at 1285. Likewise, Brent Bell here attests that Bell Trans is licensed by the DOT, with USDOT Number 194104, (*see* Brent Bell Decl. 2 ¶ 3, ECF No. 90-1), and Larry E. Bell, Jr. attests that Bell Limo is licensed by the DOT, (*see* Larry Bell Decl. 2 ¶ 5, ECF No. 90-1).

Second, the *Vidinliev* court found that limousine drivers meet the "safety [of] operation" part of the second part of the test. 581 F. Supp. 2d at 1286. It cannot reasonably be disputed that limousine drivers affect the safety of operation of motor vehicles.

Third, the *Vidinliev* court found that the defendants satisfied the interstate commerce requirement of the second part of the test. *Id.* at 1286–87. The court noted that a defendant need not show that every plaintiff had actual involvement in interstate transportation. *Id.* at 1286. Rather, the defendant need only show that:

> (a) some of its drivers were involved—by evidence of actual or solicited trips—in interstate motor vehicle transportation, (b) the involvement with interstate motor vehicle transportation was no more than four months prior to the pay period at issue ("four-month rule"), and (c) the plaintiff did make, or could have reasonably have been expected to make, one of those interstate trips.

*Id.* (citing *Reich v. Am. Driver Serv.*, 33 F.3d 1153, 1156 (9th Cir. 1994)) (footnote omitted). The defendants in *Vidinliev* made this showing by providing evidence of 238 interstate trips during the three relevant years. *See id.* The plaintiffs also admitted that they were required to take any fares they were instructed to take and could not reject rides assigned by dispatch, meaning the plaintiffs could reasonably have been expected to make one of the interstate trips. *See id.*

Such a showing is enough, because although a defendant must show more than a *de minimis* interstate commerce nexus, this is measured by no fixed percentage, but according to the character of the employee's activities. *Id.* at 1287 (citing *Morris v. McComb*, 332 U.S. 422, 431 (1947)). The interstate commerce nexus is not *de miminis* when the interstate trips are "distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services." *Morris*, 332 U.S. at 433. The *Vidinliev* court found that the plaintiff drivers in that case satisfied the interstate commerce aspect of the third part of the test because their duties as drivers fit this fact pattern. 581 F. Supp. 2d at 1287–88.

In this case, Brent Bell attempts to make a similar argument by attesting that approximately 60% of Bell Trans's revenues were derived from trips to and from the airport carrying passengers arriving from other states or departing to other states (Brent Bell Decl. 3 ¶ 12, ECF No. 90-1), and 7% of revenues were derived from trips from Nevada to other states such as Arizona or California, (*id.* at 3 ¶ 14). He also attests that the airport and interstate trips were

assigned indiscriminately among Bell Trans's drivers. (*Id.* at 4 ¶ 15). Larry Bell makes similar attestations, indicating that 837 of Bell Limo's 7,308 trips in 2008 involved transportation to or from another state, and that 2,871 of the trips were interstate through tickets. (Larry Bell Decl. 2 ¶ 8, ECF No. 90-1). He attests similarly as to Bell Limo's trips in 2009, and that every Bell Limo driver is and was qualified and required to make interstate trips, as necessary. (*Id.* at 2 ¶¶ 4, 9).

Although Brent and Larry Bell's attestations regarding the numerous trips their employees made to and from states other than Nevada do weigh in favor of a finding that their employees were involved in interstate commerce beyond a *de minimis* degree--particularly because all of their employees appear qualified to make such interstate trips and must do so if the need arises, their attestations concerning "through tickets" and trips to or from the airport do not. An employer may meet the requirement that its employees were engaged in activities that directly affect interstate commerce by showing that there was "practical continuity of movement across state lines from the point of origin to the point of destination," even if the route is wholly intrastate. *Morrison v. Quality Transports Services, Inc.*, 474 F. Supp. 2d 1303, 1310 (S.D. Fla. 2007). In the "through-ticketing" context, the "through-ticketing arrangement must be between the motor carrier and air carrier for continuous passage in order to render the motor carrier's operation interstate transportation." *Rossi v. Associated Limousine Services, Inc.*, 438 F. Supp. 2d 1354, 1362 (S.D. Fla. 2006). Where, however, a carrier "transports passengers between an airport and another point in the state, operating wholly within a state, selling no through tickets, and having no common arrangements with connecting out-of-state carriers, such transport represents intrastate commerce regardless of the passengers' ultimate destination or intent to complete an interstate journey." *Gilmer v. Alameda-Contra Costa Transit District*, No. C 08-05186 CW, 2010 WL 289299, *12 (N.D. Cal. Jan. 15, 2010).

Under this definition of through ticketing, it is not clear what percentage of Defendants'

business operations actually involved true through tickets. Although the arrangement between Jet Blue and Bell Trans that Breck Opeka--the General Manager of Bell Trans--alludes to in the declaration attached to the Motion, (Opeka Decl. 2 ¶ 4, ECF No. 90-2), and then further explains in her declaration supporting the Reply, (Opeka Decl. 8 ¶ 21, ECF No. 109-1), may well constitute through ticketing, in that it appears as though all money is paid by the client to Jet Blue, which then seamlessly provides the client with a flight and a voucher for a ride in a Bell Trans vehicle once the client arrives in Las Vegas, much of the other activity Defendants seem to count as "through ticketing" is not. Whereas Larry Bell views the term "through ticketing" to be applicable wherever "the passengers depart from a location outside Nevada and travel to a destination in Nevada; or commence their journey in Nevada bound for a destination outside Nevada," (Larry Bell Decl. 2 ¶ 6, ECF No. 90-1), more needs to be shown for interstate activity to be present. Simply picking up a passenger from the airport who had just flown in from Oregon is not enough; there needs to be a showing that that trip was part of a continuous flow of movement across state lines, normally facilitated by an agreement with the air carrier. Defendants have not demonstrated that this was the case with regard to all of the trips they label as "through tickets."

Thus, though the trips of Defendants' employees to and from other states does fulfill the interstate activity requirement, *see Morris v. McComb*, 332 U.S. 422, 433 (1947) (finding the interstate activity criterion satisfied even though only 3.65% of the shipping company's trips were interstate), this question is much closer than Defendants would have one believe.

2. <u>Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users and Technical Corrections Act</u>

Plaintiffs argue in opposition that the exemption to the FLSA overtime pay requirements

Defendants rely upon was narrowed by both the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") on August 10, 2005 and the SAFETEA-LU Technical Corrections Act of 2008 ("Technical Corrections Act"). Plaintiffs' argument is convincing.

The *Vidinliev* court distinguished between pre-August 10, 2005 claims (for which employers of drivers of limousines, which weigh less than 10,001 pounds, are exempt) and post-August 10, 2005 claims (for which employers of limousine drivers are not exempt). First, Plaintiffs argue that SAFETEA-LU contracted the Secretary's jurisdiction by redefining "motor carrier" from a person providing "motor vehicle transportation" to a person providing "commercial motor vehicle [] transportation." *See* 49 U.S.C. § 13102. "[C]ommercial motor vehicles" include only those vehicles weighing at least 10,001 pounds. *See* § 31132(1)(A). Defendants admit their limousines do not weigh that much. (Brent Bell Decl. 2 ¶ 6, ECF No. 90-1).

Subsequently, the Technical Corrections Act, passed on June 6, 2008, replaced "commercial motor vehicle" in § 13102 with "motor vehicle" and thereby "restored the definition of motor carrier to its pre-SAFETEA-LU state." *Vidinliev*, 581 F. Supp. 2d at 1288 (citing SAFETEA-LU Technical Corrections Act § 305(a), Pub. L. No. 110-244, 122 Stat. 1572 (2008)). The defendants in *Vidinliev* argued that the Technical Corrections Act was intended to apply retroactively to the brief period from August 10, 2005 to June 6, 2008 when the motor carrier exemption to the FLSA overtime pay requirements applied only to drivers of vehicles weighing at least 10,001 pounds. The *Vidinliev* court found that the relevant language in the Technical Corrections Act was actually an amendment to the ICC Termination Act of 1995, not to SAFETEA-LU, and that, in any case, Congress' intent to make the Technical Corrections Act

retroactive was not unambiguous, so although the historical definition of the motor carrier exemption had been restored by the Technical Corrections Act, the effect was not retroactive, and the plaintiff drivers could therefore proceed with their case unimpeded by the motor carrier exemption with respect to the time period from August 10, 2005 to June 6, 2008. *See Vidinliev*, 581 F. Supp. 2d at 1288–91.

Likewise, Defendants in this case are not entitled to summary judgment on the FLSA overtime pay claims for the time period between passage of SAFETEA-LU on August 10, 2005 and passage of the Technical Corrections Act on June 6, 2008. *See Cleveland v. City of Los Angeles*, 420 F.3d 981, 988 (9th Cir. 2005) ("The FLSA is construed liberally in favor of employees; exemptions are to be narrowly construed against the employers seeking to assert them" and "an FLSA exemption will not be found except in contexts plainly and unmistakably within the given exemption's terms and spirit") (internal quotation marks and citations omitted)).

Plaintiffs also argue that although the Technical Corrections Act restored the previous definition of "motor carrier," it also explicitly reaffirmed the new, narrower scope of the motor carrier exemption by clarifying that the FLSA's overtime protections extend to "covered employees"--those employees whose work involves the operation of motor vehicles weighing 10,000 pounds or less--notwithstanding the exemption. *See* Technical Corrections Act § 306(c). Plaintiffs are correct.

It is true that section 305 of the Technical Corrections Act restored the previous definition of "motor carrier." If this had been the last word, then post-June 6, 2008 FLSA overtime claims by limousine drivers would be exempted. But at the same time that Congress restored the old definition of "motor carrier," it also passed section 306, which explicitly adopted a special definition for "covered employee" applicable to the scope of the protections of 29

U.S.C. § 207. *See* Technical Corrections Act § 306(a), (c).[1]

The definition in §306(c)--which applies to employees who drive vehicles weighing 10,000 pounds or less--fills the gap left by the previous law, which required a circuitous examination of the statutes defining the Secretary's control, resulting in the conclusion that the FLSA overtime provisions applied only to those drivers whose vehicles weighed at least 10,001 pounds. That § 306 abrogates the historical motor carrier exemption is clear, because subsection (a) states that the protections of § 207 of the FLSA shall apply to covered employees--as defined in § 306(c)--"notwithstanding section 213(b)(1) of [the FLSA] (29 U.S.C. 213(b)(1))." Technical Corrections Act § 306(a). Section 213(b)(1) of Title 29 is the basis of the motor carrier exemption, which denies FLSA § 207 protections to those employees the Secretary has the power to regulate under 49 U.S.C. § 31502, which applies to "motor carrier[s]," *see* 49 U.S.C. § 31502.

Until the Technical Corrections Act was passed, whether an employer fell within the definition of a "motor carrier" was dispositive of an employee's protections under § 207 of the FLSA. But § 306 of the Technical Corrections Act provides additional coverage under its own standards. The coverage of employers as defined in § 306 of the Technical Amendments Act is effective "notwithstanding" the fact that such employees would be otherwise exempted from coverage under §213(b)(1) of the FLSA.

The retroactivity of the Technical Corrections Act is therefore ultimately inapposite. If it is not retroactive, which appears to be the case, then § 305 of the Act restoring the previous definition of "motor carrier" in 2008 does Defendants no good for employment activity during the 2005–2008 period. But even if the Act is retroactive to 2005, the gap-filling provision in

---

[1] Section 306 of the Act has not been codified into the United States Code, but it was a part of the Act.

§ 306 of the Act makes the protections of § 207 of the FLSA applicable notwithstanding the fact that Defendants' activities do not fall under the pre-2005/post-2008 definition of "motor carrier."[2] Accordingly, Defendants' present summary judgment motion must be denied.

3. Safe Harbor Period

Finally, the Technical Corrections Act includes a one-year "safe harbor" period from August 10, 2005 to August 9, 2006 if an employer did not have actual knowledge that the employer was subject to the requirements of section 7 of the FLSA with respect to the covered employee. *See* Technical Corrections Act § 306(b)(1)(A)–(B). This would mean that from December 19, 2005 to August 9, 2006 Defendants would not be liable to Plaintiffs for violations of the FLSA if Defendants had no actual knowledge that SAFETEA-LU contracted the scope of the exemption.

However, there is a question of fact as to whether Defendants actually knew about the change in the law. Although Brent Bell declared that he was "unaware that limousines that weighed less than 10,000 pounds did not qualify for the 'overtime exception' that applied before August 10, 2005 and after June 6, 2008," (Brent Bell Decl. 2 ¶ 5, ECF No. 90-1), which arguably could be viewed as a declaration that he did not know he was subject to the FLSA requirements with respect to limousine drivers, the declaration of Larry Bell--the President of Bell Limo--contains no indication that he was ignorant of this statute, despite Defendants' arguments to the contrary, (*see* Reply 24:22-23, ECF No. 109). Absent such a showing on the part of Larry Bell, summary judgment cannot be granted as to the one-year window during which the "safe harbor"

---

2 In their untimely Reply (ECF No. 109), Defendants argue for the first time that the protections of the FLSA are inapplicable to Plaintiffs because the majority of vehicles operated by Defendants seat more than eight people, (Reply 7–11, ECF No. 109). However, neither this argument nor the newly-provided declaration supporting it will be considered at this time, as Plaintiffs did not have an opportunity to respond to them. *See Zamani v. Carnes*, 491 F.3d 990, 991 (9th Cir. 2007) (indicating that "[t]he district court need not consider arguments raised for the first time in a reply brief").

provision would have applied. Defendants have not fulfilled their burden of demonstrating that their organizations had no actual knowledge that they were subject to the requirements of section 7 of the FLSA beginning in August of 2005.

4. Conclusion

In conclusion, Defendants are not entitled to summary judgment on the FLSA overtime pay claims based on the motor carrier exemption. According to the class definitions, the relevant time period in this case is December 19, 2005 through December 18, 2008--the three years preceding the filing of the Complaint. If the traditional exemption standard applied, Defendants would be entitled to summary judgment on the FLSA overtime claims, but the entire relevant period in this case falls within the non-exempt period after August 10, 2005. Some of this time period--December 19, 2005 through August 9, 2006--falls within the one-year statutory safe-harbor period, but it is a question of fact whether Defendants actually knew of the change in the law. Therefore, Defendants are not entitled to summary judgment for claims arising during that time period. The Court will deny the Motion for Summary Judgment – FLSA (ECF No. 90).

**B. Defendants' Motion for Summary Judgment – State Law (ECF No. 92) and Plaintiffs' Motion to Strike (ECF No. 97)**

The last day to file dispositive motions in this case was February 15, 2010. Judge Jones extended the date to March 15, 2010. (*See* ECF No. 78). On March 15, 2010, Defendants filed a Motion for Summary Judgment (ECF No. 80) against Plaintiffs' FLSA claims, and Plaintiffs moved for a stay, pending additional discovery, (*see* ECF No. 83). Defendants later withdrew the FLSA summary judgment motion in order to give Plaintiffs more time to respond to it, and Plaintiffs in turn withdrew their motion to stay. There was, however, no stipulation or order to extend the time to file dispositive motions. Plaintiffs simply stated in their withdrawal that the parties had agreed to waive time limitations on the re-filing of the withdrawn motions. (*See* ECF

No. 87).

Nevertheless, on June 15, 2010, Defendants filed the present Motion for Summary Judgment – State Law (ECF No. 92). Plaintiffs have moved to strike the filing as untimely. (*See* ECF No. 97). The motion is untimely, and there is nothing in the record indicating an extension of time with regard to such a motion by either stipulation or order, or any waiver of objection by Plaintiffs except to the re-filing of the summary judgment motion concerning the FLSA claims. The Court will therefore strike the Motion for Summary Judgment – State Law (ECF No. 92).

**CONCLUSION**

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment – FLSA (ECF No. 90) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Strike (ECF No. 97) is GRANTED. Defendants' Motion for Summary Judgment – State Law (ECF No. 92) is hereby stricken.

DATED this 25 day of February, 2011.

Gloria M. Navarro
United States District Judge